## MONSANTO CHEMICAL WORKS v. JAEGER et al.

District Court, W. D. Pennsylvania. January 23, 1929.

No. 1892.

Sterrett & Acheson, James R. Sterrett, Mark W Acheson, Jr., and William B. Wharton, all of Pittsburgh, Pa., and Paul Bakewell, of St. Louis, Mo., for plaintiff.

H. Dorsey Spencer and Robert A. Norton, both of New York City, and Alter, Wright & Barron, George E. Alter, and Ralph D. McKee, all of Pittsburgh, Pa., for defendant Jaeger.

THOMSON, District Judge. This is a bill in equity praying for specific performance of two written contracts, one relating to sulphuric acid and the other relating to phthalic anhydride.

The plaintiff owns and operates two manufacturing plants, one at East St. Louis, Ill., and the other at St. Louis, Mo. At the former plant, one of its' products of manufacture is sulphuric acid and at the latter phthalic anhydride.

The defendants are experienced chemists, and are the inventors and discoverers of certain new processes and contact masses for the manufacture of sulphuric acid and phthalic anhydride. The chemists being desirous to sell, and the company to purchase, the exclusive rights to use said processes and contact masses and all their United States and foreign patents, when and as issued on the same, written contracts were entered into to effect such purpose, the one relating to sulphuric acid and the other to phthalic anhydride, which agreements form the basis of this suit. Each agreement consisted of two parts, designated respectively an "option agreement" and a "purchase agreement"; both documents relating to sulphuric acid being dated June 26, 1925, and those relating to phthalic anhydride both being dated July 23, 1925. In both option agreements the company was given the right to investigate such processes and contact masses to determine whether they were satisfactory. For this purpose the chemists agreed, in the sulphuric acid contract, to start immediately the preparation of their contact masses and the testing of these masses in the laboratories of the company and diligently proceed with the work until a sufficient amount of the contact mass or masses had been prepared for the company's semicommercial test. At least one of the contact masses prepared was to be a nonplatinum containing mass, which will give, on laboratory test, a conversion of $S O_2$ to $S O_3$ of from 97.3 per cent. to 98.5 per cent. During the time for preparation of such contact mass or masses, the company agreed to pay the chemists a salary of $500 each per month, and certain other designated expenses extending over an estimated period of three months from the date of the agreement. This salary, if the company exercised its option of purchase, to be deducted from any royalty payments due under the purchase agreement. The company agreed to furnish the chemists a laboratory for preparation of their contact masses and testing the same, and to supply, at its own expense, such small equipment and supply of chemicals as are reasonably required. The period of four months was given for the delivery of the contact mass to the company for its semicommercial test. At the time of such delivery, the chemists to furnish the company full data for calculating the cost of manufacture of their contact mass or masses on a commercial scale, guaranteeing to the company that the cost of a contact mass equal in all respects to that delivered for test will not exceed a given sum per pound or litre, for material or labor required to manufacture such mass.

In case such contact mass could not be produced by the company at a cost equal to, or less than, that specified in the guaranty, the company to be released from its obligation to pay royalties under the contract, and shall discontinue the use of said contact mass. The chemists conveyed to the company an exclusive option for the purchase of all their processes for sulphuric acid contact masses and their preparation, and an exclusive option to all United States patents and foreign patents which may be later granted on their inven-

tions on sulphuric acid contact masses, "the terms of which purchase are set forth in the proposed purchase agreement attached to this option agreement and initialed by the parties." The option runs for a period of four months from the date of the delivery of the contact mass for the company's tests. If the company accepted the option, it was to notify the chemists in writing before the expiration of said four months.

The purchase agreement prepared and signed as aforesaid, contemporaneously with the option agreement, was to carry into effect the proposed purchase specified in the option agreement, in the event the company exercised its option of purchase within the time limit specified, namely, on or before June 26, 1926. In that event, "the chemists agree to comply immediately and will assign to the company an exclusive license to all patents, domestic and foreign, which have been, or may be, granted to the chemists on their inventions concerning contact masses for sulphuric acid, and on the processes of manufacturing such contact masses. The chemists will immediately file patent applications on all inventions they have made concerning all contact masses for sulphuric acid manufacture, and will do everything possible to insure the prompt granting of the patents. * * * *" "The chemists will, at the request of the company, carry out any additional research work which the parties agree is necessary to allow the filing of other patent applications to properly protect their mutual interests, and it is agreed that the cost of such research work shall be paid for by the company." Then follow terms as to the royalties which shall be paid to the chemists for the period of five years, provisions for licensing other sulphuric acid plants, and other provisions not important in the determination of the present issue.

In like manner, the phthalic anhydride option agreement provided for the company's right to investigate the processes and contact masses for its manufacture; the chemists agreeing to start immediately the preparation of such masses and their testing in the laboratories of the company, proceeding diligently with the work until a sufficient amount of the contact mass or masses had been prepared for the company's semicommercial test. The mass prepared was expected to give, on test, a yield of 100 parts sublimed phthalic anhydride quality equal to Monsanto specifications. The mass or masses were to be prepared in the laboratories of the company, the latter supplying, at its own expense, such small equipment and such supplies of chemi-

cals reasonably required to make the contact masses which the company desired to test on a semicommercial scale in co-operation with one or both chemists.

Very generally stated, the chemists proceeded under the sulphuric acid contract, furnished the contact mass or masses, the same were tested by the company, the necessary descriptive data was furnished for the use of the company, and the latter, on June 8, 1926, notified the chemists that it exercised its option of purchase under the contract.

During the period prior to June 21, 1926, the defendants drew up and filed in the Patent Office joint applications for letters patent, ten in number, covering a wide range of invention.

The phthalic anhydride contract was not carried into effect, the chemists leaving the premises on June 21, 1926, and the company having given no notice of its intention to accept the option of purchase. Each party attributes to the other the failure to consummate the agreement.

The issues here involved may be briefly stated as follows:

(1) As of what date does the sulphuric acid contract speak, June 26, 1925, its date, or June 8, 1926, the date of acceptance?

(2) What did the chemists agree to sell by virtue of the written provisions of that contract?

(3) Under a proper interpretation of the scope of the contract of sale, to what patents and patent applications is plaintiff entitled?

(4) Is the company entitled to damages for a breach of the phthalic anhydride option agreement on the ground that defendants did not give the plaintiff an opportunity to exercise its option of purchase under the agreement?

(5) Is Dr. Jaeger entitled, under his counterclaim for additional compensation for work in connection with the new converter, for work done in connection with the additional experiments in the phthalic anhydride field, and for designing and superintending the construction of a commercial plant for the manufacture of contact masses?

■ As to the first question: It is reasonably clear that the contract speaks as of its date, June 26, 1925. In the eye of the law, the two documents executed by the parties at the same time, for the same purpose, having a common date, in fact amount to a single option agreement; the terms of sale, for convenience, being inserted in a separate instrument. Just as in any other option agreement, the chemists were bound under the purchase agreement from the beginning; their release

being dependent solely on the failure of the company to exercise its option. On the other hand, the company was not bound unless and until it exercised its option of purchase. This is the legal situation in every option agreement. That the purchase agreement was intended to be an agreement effective on June 26, 1925, is clearly shown by the fact that it is so dated, and that it was fully executed by all the parties on that date. The terms were agreed upon and definitely fixed. On the part of the chemists, nothing remained to be done; on the part of the company, nothing but the acceptance of the option.

Second: What did the chemists undertake to sell, and the company to buy, under the contract? Plaintiff claims that the contract covers all masses and processes then invented and discovered, including those resulting from the research work which the chemists had carried out and reported at the plaintiff's laboratory in anticipation of the acceptance of the option.

The defendants claim that the contract grants rights only to those inventions which existed when the contract was made, contains no covenants as to future inventions, covers only inventions and not ideas unreduced to practice, and covers only inventions "concerning contact masses for sulphuric acid" and "processes for manufacturing such contact masses."

We here reach the heart of this controversy. Its solution depends on the proper interpretation of the written instruments. This may be made easier by keeping in mind certain well-established legal principles:

(a) Where specific performance is sought, vague or indefinite terms cannot be supplanted by clear and definite ones through forced or strained construction. Equity will lend its aid only in enforcing those terms which the parties themselves have made clear and definite. Henry v. Adkins (Mo. Sup.) 194 S. W. 264.

(b) When specific performance is sought of a contract, the burden of establishing the precise terms and certainty of the contract rests on him who seeks performance. Hildreth v. Duff, 143 F. 139 (C. C. 3d); Hennessey v. Woolworth, 128 U. S. 438, 9 S. Ct. 109, 32 L. Ed. 500.

(c) The word "inventions" does not include mere conceptions of the inventor, ideas unreduced to practice. This is conspicuously true when used in connection with patents and patent applications therefor. "A conception of the mind is not an invention until represented in some physical form, and un-

successful experiments or projects, abandoned by the inventor, are equally destitute of that character. These propositions have been so often reiterated as to be elementary." Justice Bradley in Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 489, 11 S. Ct. 849, 35 L. Ed. 521; Moline Plow Co. v. Rock Island Plow Co. (C. C. A.) 212 F. 727; Computing Scale Co. v. Standard Computing Scale Co. (C. C. A.) 195 F. 508; Westinghouse Mach. Co. v. General Electric Co. (D. C.) 199 F. 907, and many other cases.

(d) Presumptively a contract for the sale of inventions grants rights only to those inventions which existed when the contract was made. If the parties intend to contract for future inventions, language plainly expressive of such purpose must appear. "There is no principle of law which holds that one who has sold an article impliedly agrees thereby that he will not compete with the purchaser in the sale of the same or similar articles, or will not produce or sell anything that may serve as a substitute therefor. If Martin's conceptions did not constitute an invention within the meaning of the contract upon which the plaintiffs rely, then the fact that the system which he subsequently invented, and which the defendant company is using, was intended as a substitute for and an evasion of the plaintiffs' system, does not entitle the plaintiffs to relief." Lamson v. Martin, Supreme Judicial Court of Massachusetts, 159 Mass. 557, 35 N. E. 78.

"A naked assignment or agreement to assign, in gross, a man's future labors as an author or inventor—in other words, a mortgage on a man's brain, to bind all his future products—does not address itself favorably to our consideration." Justice Bradley in Aspinwall Co. v. Gill (C. C.) 32 F. 697.

"The law does not look with special favor on such covenants." National Cash Register Co. v. Remington Co., 242 N. Y. 99, 151 N. E. 144.

Examining the contract in the light of these principles we find: That the recitals show that the parties were speaking of present inventions on which patent applications had not yet been filed. The sulphuric acid option begins:

"Whereas, the chemists have invented and discovered certain new processes and contact masses for the manufacture of sulphuric acid and have prepared, and will prepare and file applications for United States of America letters patent and foreign letters patent thereon; and

"Whereas, the chemists desire to sell exclusive rights to use said processes and con-

tact masses and an exclusive license for the sole use of United States and foreign patents thereon as and when issued; and

"Whereas, the company desires to investigate said new processes and contact masses for the manufacture of sulphuric acid, and if found satisfactory, to have the exclusive right and exclusive license to use said processes, to make and use said contact masses for the manufacture of sulphuric acid, and an exclusive license to the United States and foreign patents thereon."

In referring to the rights which were to be given to the present inventions, the parties speak of future patents thereon. So in section 5 of the option, when the parties speak of "patents * * * which may be later granted on their inventions," they are speaking of future patents on present inventions. When in section 1 of the purchase agreement they speak of "patents * * * which have been, or may be granted * * * on their inventions," they probably contemplated the grant of patents between the date of the contract and the date of the exercise of the option. But they were undoubtedly speaking of patents which were not in existence when the contract was signed but covering inventions in existence at that time.

The reiteration in the recitals and in the body of the option contract make it clear that the contract of sale covers only contact masses for the manufacture of sulphuric acid and processes of making the same, and that these constituted the inventions which the chemists were proposing to sell. The option agreement merely provides that the chemists shall prepare in the company's laboratories a sufficient supply of "their contact masses" for the company's semicommercial test. This the company could either accept or reject. Aside from the percentage yields promised under the contract, which were fully met, the material obligations imposed on the chemists under the option are contained in these portions of the first and fourth paragraphs, namely:

"The chemists will immediately start the preparation of their contact masses and the testing of these masses in the laboratories of the company, and will diligently proceed with this work until a sufficient amount of the contact mass or masses has been prepared for the company's semi-commercial test.

"At the time of delivery of their contact masses for the company's semi-commercial test, the chemists shall furnish the company with full data for calculating the cost of manufacture of their contact mass or masses on a commercial scale and will guarantee to the company that the cost of a contact mass

equal in all respects to the contact mass turned over to the company for test, will not exceed a given sum per pound or litre."

It is provided in section 2 of the agreement that the work of the chemists was to be completed in an estimated period of three months. There is nothing in the option agreement which requires or suggests even that the chemists should make any additional experiments, research work, or any new inventions in the field of sulphuric acid contact masses. From that agreement all that was apparently contemplated was the turning over to the company certain contact masses which they had already invented, guaranteeing, at the same time, what it would cost the company to manufacture these masses. The granting clause of the option agreement is as follows:

"The chemists hereby convey to the company an exclusive option for the purchase of all their processes for sulphuric acid contact masses and their preparation, and an exclusive option to the exclusive license to all United States patents and all foreign patents which may be later granted on their inventions on sulphuric acid contact masses, the terms of which purchase agreement are set forth on the proposed purchase agreement attached to this option agreement and initialed by the parties."

The purchase agreement provides that, if the company exercises its option, "the chemists agree to comply immediately, and will assign to the company an exclusive license to all patents, domestic and foreign, which have been or may be granted to the chemists *on their inventions concerning contact masses for sulphuric acid and on the processes of manufacturing such contact masses."*

If the phrase "their inventions on sulphuric acid contact masses," found in the last section of the option agreement, means inventions made prior to the contract, the words "their inventions concerning contact masses for sulphuric acid" and "processes for manufacturing such contact masses," in the first clause of the purchase agreement, must, under any rule of interpretation, be given the same construction. They clearly refer to the same inventions.

■ If there were nothing else in the contract, under the applicable legal principles for interpretation, there would appear no escape from the conclusion that the contract of sale grants rights only to inventions existing when the contract was made, covers only inventions "concerning contact masses for sulphuric acid" and "processes of manufacturing such contact masses," and that there

are no covenants in the contract for future inventions. But the learned counsel for the plaintiff has argued with great force and earnestness that the following covenant found in section 1 of the purchase agreement makes the contact masses and processes for which applications were filed before May 16, 1926, pass under the license:

"The chemists will, at the request of the company, carry out any additional research work which the parties agree is necessary to allow the filing of their patent applications to properly protect their mutual interests, and it is agreed that the cost of such research work shall be paid by the company."

Nowhere in the agreement is there a covenant to file patent applications on future inventions. The authorities establish that, where such is the purpose of the parties, the intention must appear in clear and explicit language. Nothing could be easier to express than such intention. "Inventions they have made or may hereafter make "would remove the question entirely from the realm of argument. The covenant in question is only to carry out any additional research work "which the parties agree is necessary to allow the filing of their patent applications to properly protect their mutual interests." No evidence appears of any agreement between the parties that any further research work was necessary, or of any request of the company to carry out any such additional work. The express purpose of the additional research work is to allow the filing of their patent applications "to properly protect their mutual interests." Mutual interests are those which concern both parties to the contract. They are naturally those which arise and exist by virtue of the contract of sale. It could hardly be said that these "mutual interests" are broader or more comprehensive than their mutual obligations. The contract does not bind the company not to use other catalysts than those which it purchased from the chemists, nor did the company agree not to sublicense others to use catalysts which would compete with the catalysts invented by the chemists. In view of the repeated expressions of the courts that covenants tending toward a restraint on the future work or inventive genius of man are not looked upon with favor, that when such purpose exists it is easy to express such intention, and that when specific performance of a contract is sought, it must rest on precise terms and certainty of contract, I am wholly unable to construe the covenant in question as imposing an obligation on the chemists to assign their future inventions, or as a guaranty to the company against future competition by the use of some catalyst unthought of when the contract was signed. It surely would be impossible to base specific performance on a contract so vague and indefinite. In the case of White Heat Products Co. v. Thomas, 266 Pa. 551, Justice Frazer, at page 555, 109 A. 685, 686, aptly expressed the rule:

"Where the product of an inventive mind is sought to be appropriated under an agreement to assign to another, the language of the agreement must be clear and show an unmistakable intention that the particular matter covered by the invention or patent is within the intention of the parties. Allison Bros. Co. v. Allison, 144 N. Y. 21 [38 N. E. 956]; Joliet Mfg. Co. v. Dice, 105 Ill. 649."

After the date of the contract, June 26, 1925, during the running of the option, certain patent applications were filed by the chemists, which inventions, plaintiff claims, pass under the license by virtue of the provision for "research work." Light is thrown on the scope of the contract by a subsequent instrument, signed by the parties, known as the "Escrow Agreement," dated May 7, 1926. This paper, in its recitals, refers to the original contract between the parties "respecting new processes and contact masses for the manufacture of sulphuric acid," and that on March 1, 1926, the chemists had delivered to the company a supply of contact mass for the Chemical Works' "semicommercial test," and that the company has until July 1, 1926, in which to notify the chemists that it accepts the option contained in said agreement.

It then provides for drafting in detailed form a description of the processes, formulas, apparatus, and methods "for the manufacture and preparation of the supply of contact mass for the manufacture of sulphuric acid," so delivered to the company; the same to be sealed in an envelope and delivered to the escrow agent, to be by the agent delivered to the company, if, on or before July 1, 1926, it accepts the option "for the purchase of such formulas and processes for the manufacture of contact masses for the manufacture of sulphuric acid in accordance with the contracts between the chemists and Chemical Works, dated June 26, 1925," otherwise the same to be delivered to the chemists.

Quite evidently there is nothing in this escrow agreement which would give the company any broader rights than those contained in the original contract to which it definitely refers, and the general scope and

purpose of which it definitely specifies. Although nearly a year had passed from the making of the original contract, and any rights to subsequent inventions and discoveries, which it now claims, were then in existence, subject only to its acceptance of the option, no reference is made to any such claim. Undoubtedly the inventions and processes of which they were speaking were those which related to the manufacture of the supply of contact mass delivered to the company on March 1, 1926. There is no suggestion that the formulas and processes referred to related to other contact masses, and certainly not to contact masses not conceived of when the original contract was made.

In order to confine this opinion within some reasonable limits, I find the following facts:

(1) The sulphuric acid contract speaks, and is operative, from its date, June 26, 1925.

(2) The contract embraces only the invention or inventions existing at the date of the contract concerning contact masses for the manufacture of sulphuric acid and the processes of manufacturing such contact masses.

(3) Dr. Jaeger came to this country in 1923, and entered the employ of the National Anlene & Chemical Company at Buffalo, N. Y. He, with his assistant, Dr. Daniells, in the latter part of 1924, invented two kinds of catalysts, one so-called stabilized phthalic catalyst and the other zeolite catalysts, the latter being vanadic pentoxide zeolites of two types, to wit, diluted and undiluted. Dr. Bertsch came to the United States in January of 1925, being an assistant and member of Dr. Jaeger's group at Buffalo.

(4) The defendants' inventions are embraced in Plaintiff's Exhibit No. 3, outlined in patent No. 1,657,754, and consist of diluted and undiluted zeolites, which are the reaction products of two components, and which contain, as the sole catalytic element, pentavalent vanadium in nonexchangeable form for use in contact sulphuric acid processes, which class of contact masses and processes of using the same form a portion of the subject-matter of patent applications Nos. 88,487 and 95,771, the former being a process, and the latter a product, application.

(5) The only really successful catalyst, as shown by the evidence, prior to defendants' invention, was platinum. This was a very expensive product, subject to poison by such substances as arsenic, chlorine, and others, which might get in the gases, and it was an expensive process to remove these impurities in quantity manufacture. The defendants' invention has become commercially successful by using zeolites containing vanadium ozide in that portion of a molecule which is not affected by base exchange. This is one of the patents in question working with high efficiency and giving excellent results from 97 per cent. to 97.5 per cent.

(6) The next step in the advance of the science was to use nonsiliceous base exchange products, which is covered by one of the patents here, being a very distinct step from the previous patent and is quite successful, giving high efficiency, as much as 98 per cent.

(7) A zeolite is a base exchanging polysilicate. Its essential constituents are a base which is exchangeable, usually sodium, calcium, or other base forming metals. It is a metal which can be exchanged in the molecule when treated with salts of other similar metals; and reversibly, having been exchanged, it can again be treated with the salt of a metal which was exchanged, and the reverse action takes place. A zeolite always has three components, of which silica is one. This is covered by patent No. 1,676,308, Plaintiff's Exhibit No. 10. The catalyst here is distinguished and different from any catalyst which is a zeolite, in that it does not contain silica as its base. It is a nonsiliceous base exchanging body. A substance may have base exchanging properties and not contain silica, but it would not be a zeolite unless it contained silica.

(8) Besides No. 10 catalyst, which was delivered to the company, the chemists delivered another catalyst for sulphuric acid, while at Monsanto. They used the other zeolite catalyst which corresponds to this. The first is called vanadic pentoxide zeolite, the second is called vanadyl vanadium tetroxide zeolite. This was delivered at Monsanto, and is described in the same patent in which the vanadic pentoxide zeolite is described. This goes under the brand of a vanadium zeolite, that is, a catalyst which is a zeolite, in which vanadium is in the zeolite structure, whether within vanadium tetroxide or vanadium pentoxide. This catalyst is described in patent No. 1,657,754, Exhibit 3, which also described the vanadium pentoxide catalyst.

(9) Drs. Jaeger and Bertsch went to the premises of the plaintiff about June 10, 1925, to begin their work under the tentative agreement as to the demonstration of the catalysts and the making of sufficient catalysts for the semicommercial test; the company furnishing the materials, this work continuing for several weeks. Their first work was the making of test catalysts for comparison purpos-

es with which they had theretofore been familiar. None of these were zeolite catalysts. The first zeolite catalyst made by the chemists at St. Louis, and the one which they had theretofore invented, is catalyst No. 10, being the same as that made by Dr. Jaeger at Buffalo. This was put into the converter about July 16, 1925, and was made as soon as they got the necessary potassium waterglass solution.

(10) In August of 1925, the company suggested that the chemists supply, instead of catalysts for semicommercial test, sufficient catalysts for commercial scale demonstrations in a commercial grillo converter; data on the grillo converter being furnished by the company. The chemists submitted drawings of a "grillo converter with partly heat-exchanging new type," embodying their invention in sulphuric acid converters. After consideration, the company decided to build a converter embodying the chemists' improvements in sulphuric acid converters, which work was completed perhaps in October of 1925.

(11) In November of 1925 there was a proposition of a partnership between Mr. Queeny of the Monsanto Company and Drs. Jaeger and Bertsch, in which the defendants submitted a long outline of inventions which they might bring into the proposed partnership, these including the vanadic pentoxide purification process, a new converter for sulphuric acid, and a large number of others, excepting therefrom the sulphuric and phthalic inventions on which they had given options to the plaintiff.

(12) In December of 1925 the manufacture of catalysts for commercial scale test began, which was completed in January of 1926. Prior to February 26th a calcining apparatus, equipped with a preheater provided by the company, was erected at East St. Louis from designs furnished by the chemists. This apparatus burned out, and prior to March 1, 1926, the chemists designed, and the company built, a new pre-heater. After full test for commercial use, the catalyst was calcined in this new apparatus, and was delivered to the company on March 1, 1926. On May 7, 1926, the escrow agreement was executed, and a full description of the composition of the catalyst and mode of manufacture was signed and deposited with the escrow agent. On June 8, 1926, the company notified the chemists that it exercised its option of purchase under the contract.

(13) The company paid to the chemists the salaries called for in the contract, and bore the expenses of the equipment, chemicals, and apparatus necessary in the progress of the work. The expenses incident to the filing of patent applications were not paid by the company.

(14) The phthalic anhydride contract called for a laboratory demonstration to deliver sufficient contact mass for a semicommercial test. The chemists built the necessary apparatus for the laboratory demonstration and made a catalyst which had been worked out at Buffalo. After certain troubles in the apparatus which they had built were corrected, the catalyst, when tested, showed an efficiency of over 90 per cent. theory, giving from 92 per cent. to 97 per cent. conversion. While it seemed not to be questioned by the company that the contact mass was good, the latter took the position that the output was not large enough for their purpose, and they were therefore not willing to accept the mass. The chemists then showed the company the plans for a Badische converter designed by Dr. Bertsch, which they claimed would make 1,000 to 1,200 pounds a day. This the company objected to on the ground that it was too expensive and could not be built in this country.

(15) In an endeavor to overcome these conditions, the chemists tried, as requested, to load their catalyst higher, and then to make the catalyst as concentrated as possible. In this new situation, they could not make a catalyst producing yields of 90 per cent. theory, although efforts were continued by a new design and a new catalyst, extending into May of 1926. This situation continued unchanged. Differences arose between the parties as to the making of a new contract as to how salaries paid to the chemists should be charged as between the sulphuric and phthalic contracts, and the ultimate amount to be deducted from the royalties due the chemists, as well as repeated attempts to adjust their differences amicably. These efforts all having failed, the chemists left the premises about June 20, 1926. A day or two following, the company made a formal demand by letter that the chemists comply with the conditions of the phthalic anhydride contract.

(16) On or about July 10, 1926, Dr. Bertsch, in the absence of Dr. Jaeger and his wife, entered the latters' dwelling house through a window, and removed from a room upstairs, which was known as the office of Jaeger and Bertsch, certain partnership papers, and on July 13th following he went back to the plaintiff company, signed a let-

ter to Dr. Jaeger ending the partnership, and is still with the plaintiff company.

(17) During the whole period of the chemists' work with the company, a blue book, which was offered in evidence, was kept, in which were entered all of the catalysts which were made.

(18) As the phthalic agreement never went into effect, the provision for services by the chemists in connection with the designing, erection, and operation of the commercial units for the manufacture of phthalic anhydride was not operative.

(19) In addition to the applications set forth in plaintiff's bill, there were two, being Exhibits Nos. 10 and 11, one covering the use, as sulphuric acid catalysts, of nonsiliceous base exchange body; the other covering the use, as sulphuric acid catalysts, of multicomponent zeolites. These inventions were conceived and made by Dr. Jaeger after he left the plaintiff's premises.

(20) In addition to the two applications referred to in the nineteenth finding of fact, the following applications for patents were filed by the chemists during the period of their work at the Monsanto Chemical Works, namely: (a) No. 86,653, filed February 6, 1926, for catalytic oxidation of sulphur dioxide; (b) No. 86,654, filed February 6, 1926, for a particular method of treating the inside surfaces of converters to be used in making phthalic anhydride; (c) No. 86,-652, filed February 6, 1926, and No. 88,488, filed February 15, 1926, being modified forms of zeolite, or rather the product obtained when the zeolite is treated with certain other chemical compounds; (d) No. 91,229, filed February 27, 1926, and No. 100,116, filed April 6, 1926, directed to various zeolites as chemical compounds, irrespective of their use; (e) No. 100,818, filed April 9, 1926, covering a converter, and No. 109,429, filed May 15, 1926, being a method of purifying vanadic oxide.

I cannot stop to discuss the evidence upon which these various findings are based, many of which are not controverted, or not seriously so. Where a conflict of evidence existed, I endeavored, from the witnesses themselves and their manner of testifying, to give the testimony of each such probative value as the circumstances seemed to warrant or demand. In spite of the fact that Dr. Bertsch, one of the defendants, in his answer to the bill, admitted the facts averred and joined in the prayer of the bill, when I considered his various attitudes and actions along the line of the case, and regarding him from the standpoint of a witness on the stand, I felt compelled to largely discount his evidence when it came in conflict with other evidence apparently credible and reliable.

## Conclusions of Law.

First. Plaintiff is entitled to have the sulphuric acid contract specifically enforced, so far as relates to the inventions for the manufacture of sulphuric acid and processes for manufacturing the same, as described in patent applications No. 88,487 for the process, and No. 95,771 for the product, and as set forth and outlined in patent No. 1,657,-754, Exhibit No. 3.

Second. The fact that certain inventions were made by the chemists while they were upon the plaintiff's premises, and with the plaintiff's laboratory, facilities, materials, funds, and property, does not give the plaintiff any proprietary interest in the inventions, in the absence of an express agreement to that effect; but it does give the plaintiff a shop right to use what was actually built on its premises, and a shop right to use certain processes developed on its premises, and at least partially at its expense and which the chemists allowed the company to use.

These general principles are established in Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667; Dalzell v. Dueber Mfg. Co., 149 U. S. 315, 13 S. Ct. 886, 37 L. Ed. 749; Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033.

These shop rights to which the plaintiff is entitled are as follows: (a) Shop right in converter devised by the chemists, being plaintiff's Exhibit No. 8; (b) Shop right for purification of vanadic oxide, Plaintiff's Exhibit No. 9; (c) Shop right in processes for treating the inner surface of phthalic converters, called inactivation of phthalic converters, Plaintiff's Exhibit No. 2-(A); (d) Shop right in process used for elimination of purification process; that is, for elimination in the manufacture of sulphuric acid of the purification of sulphuric dioxide gas, Plaintiff's Exhibit No. 2.

Third. Under all the facts of the case, I cannot find that defendants were guilty of a breach of the phthalic anhydride contract, and the bill, so far as that contract is concerned, is dismissed.

Fourth. The defendants' counterclaim cannot be sustained in this action, and is accordingly dismissed.

Fifth. Defendants are entitled to an accounting by the plaintiff for the royalties received by it under the sulphuric acid contract.

Let a decree be drawn in accordance with this opinion, costs to be paid by the defendants.