**ROTARY LIFT COMPANY**
v.
**A. Wiley CLAYTON.**
Civ. A. No. 51–485.

United States District Court,
D. Massachusetts.
Sept. 27, 1954.

W. R. Hulbert, Hector M. Holmes (of Fish, Richardson & Neave), Boston, Mass., Albin C. Ahlberg, Ahlberg, Wun per & Gradolph, Chicago, Ill., for plaintiff.

Stuart Macmillan and Samuel F. Clapp (of Haussermann, Davison & Shattuck), George C. Cutler, Jr., Ralph F. Tuller, Boston, Mass., for defendant.

McCARTHY, District Judge.

The plaintiff, Rotary Lift Company, is a corporation organized and existing under and by virtue of the laws of the State of Delaware. The defendant, A. Wiley Clayton, is a citizen of the State of Tennessee. At the time of the institution of this action, he was a student at the Massachusetts Institute of Technology in Cambridge, Massachusetts. The matter in controversy exceeds the sum of $3,000, exclusive of interest and costs.

This is a suit for specific performance to compel the signing of an application for a patent together with an assignment of such patent application. By way of counterclaim the defendant seeks the rescission of an "employee's agreement for assignment of inventions". The facts are as follows:

The plaintiff is engaged in the manufacture and sale of automobile lifts, freight and passenger elevators and other equipment. The defendant was employed by the Company on June 1, 1942, and it is clear that he left its employ on September 9, 1949.

Clayton is a graduate of a technical high school in Memphis, Tennessee. After graduation, and before entering Rotary Lift's employ, he worked in the waste control department of Firestone Tire & Rubber Company at Memphis. His first assignment at the Rotary Lift Company was as a draftsman and operator of a blueprint machine at a salary of $90 a month. From time to time thereafter it was increased until in 1949 his wage reached $335 a month. Besides operating the blueprint machine, Clayton prepared drawings or sketches under the supervision of older employees in the engineering department. Later he was sent out with employees in the service department to investigate difficulties which developed in elevator equipment manufactured by the Company and installed by a distributor who held a franchise for the sale of its equipment. During the last two years of employment his work consisted largely of the preparation of drawings and illustrations for the service manual and catalogues published by the company. He was not engaged in research or design activities at any time, nor was he working on technical drafting projects primarily.

Among the installations of elevators by the company was one at the Convent of the Good Shepherd at Memphis which was the subject of service difficulties. The elevator was equipped with a "P53 control valve", a valve which had been designed by John W. Harrison, then the company's chief engineer, and Lawrence Jaseph, the Chief Design Engineer. Clayton told Harrison that he believed that the trouble was attributable to the faulty design of the valve rather than poor workmanship in the factory as Harrison had contended. Harrison remained unconvinced. He forbade Clayton to work on designs and instructed him to stick to his regularly assigned duties.

Clayton then began to devote his spare evenings to the problem. He built a model by-pass valve, prepared a sketch of his idea, and delivered it to Harrison. Harrison spoke disparagingly of its value.

In March of 1949, Harrison placed upon Clayton's desk the "Employee's Agreement for Assignment of Inventions" which read as follows:

"In part consideration of my employment by Rotary Lift Company of Memphis, Tennessee, and of wages and salary to be paid by that company to me, I .............. Wiley Clayton ........... hereby agree promptly to disclose to that Company, in any manner it may prescribe, inventions conceived or developed by me during the entire term of my employment by that Company and for a period of one year thereafter, and which inventions relate in any way to any business in which that Company is or may become interested during the terms of my employment; and for the same consideration I hereby grant and agree formally to convey to Rotary Lift Company, its successors, and assigns, the entire right, to each and all such inventions and in and to all patent rights thereto, and I further agree, without charge to that Company, but at its request and at its expense, promptly to sign, acknowledge and deliver to that Company, or to any agent it may designate, all applications for patent, assignments and such other papers and to perform such other acts as that Company may deem necessary or expedient to obtain domestic and foreign patents on such inventions and to vest title thereto in Rotary Lift Company, its successors and assigns.

"Witness my hand and seal this third day of March, 1949.

Wiley Clayton

"Witness:
    J. B. Harrison"

The signatures, of course, had not been placed upon the paper at that time. Clayton balked at signing and

told Harrison that he wanted to take the paper to an attorney. Two days later he told Harrison he would like to have some changes made. When Harrison refused to do so, he (Harrison) made a remark to the effect that if Clayton refused to sign, he could expect to encounter difficulty when he sought other employment. Clayton affixed his signature to the document.

About four months later, at Harrison's request, Clayton prepared a description of his "by-pass control valve" for incorporation in Harrison's "idea file"; then, in September of that year, a few days before Clayton left the employ of the company, Harrison said that the company might want to "patent the valve".

A year and a half later, when Clayton was a student at the Massachusetts Institute of Technology the company submitted to him a formal patent application for approval. He declined to execute it, and this suit followed.

Several factors in this case are deserving of emphasis. First, with respect to the nature of Clayton's employment, it is to be noted that he was not employed as a research man or design engineer. He was a "student draftsman" for a portion of the time, went out with other employees in the service department to investigate complaints with respect to certain of the company's installations of elevators, made sketches for manuals, and was used as a photographer on a contract basis. In brief, he was not *hired* to exercise his inventive ability.

Secondly, the "employee's agreement" was a form which was distributed to a number of the Rotary Lift employees. They were required to sign as a condition of continued employment. The contract was made by filling in names and dates, and is obviously of the type that employees are asked to sign at the time that they *enter* upon their work.

■ The enforceability of agreements to assign inventions is not at issue here. The nub of the problem in this case is simply whether the contract in question covered the Clayton "by-pass valve" idea which was conceived long prior to the execution of the agreement. The answer must be in the negative.

Both the nature and the language of this contract support the defendant's contention that it was not retroactive. As has been stated hereinbefore the form was of the type submitted to employees when they enter upon their work, and which looks to inventions which may be conceived after the contract is signed. In passing it might be stated that if the plaintiff's contention were correct with respect to the contract having retroactive application, Clayton might have been discharged the day after signing the form and his "valve" idea would be the property of his employer. The language employed in the contract looks to the future also. By its terms the defendant binds himself " * * * promptly to disclose to that company, in any manner it may prescribe, inventions conceived or developed by me during the entire term of my employment and * * * to convey * * * all such inventions". Clayton could not have understood that he was binding himself to "disclose" an invention that had already been disclosed. Furthermore, the consideration for the defendant's promise was "wages and salary *to be paid*" by the company.

The plaintiff has placed great stress upon one word contained in the form. It has emphasized Clayton's agreement to disclose inventions conceived during the *"entire"* term of his employment. Since, however, this form would have been executed normally at the beginning of the term of employment, it would have prospective application. The word "employment" itself, as used in this contract in the first sentence, unquestionably has a future intendment. The phrase "entire term" of

employment, therefore, in this context, should be interpreted similarly.

Under familiar principles of contract law if the language in a contract is ambiguous, it is to be interpreted most strongly against the party who drew it. Furthermore, equity will lend its aid only in enforcing those terms which the parties themselves have made clear and definite, Monsanto Chemical Works v. Jaeger, D.C., 31 F.2d 188, 191, and the burden of establishing the certainty of the contract rests on him who seeks performance. Had the parties intended that this agreement should cover the idea already conceived by Clayton, they could easily have inserted in the contract the provision that the employee agreed to convey his interest in "inventions made by the employee in the past, while employed by the company" as well as inventions which he might make thereafter.

It follows that the plaintiff is not entitled to have the contract specifically enforced. The complaint must be dismissed. On the other hand, neither can the prayers of the defendant's counterclaim be granted. Rescission of the contract has been sought on the ground that duress was employed. I am unable to find that there is sufficient evidence to warrant that conclusion. I am not unmindful, in arriving at this determination, of the pressure which was exerted upon the defendant to execute the patent application while he was a student at the Massachusetts Institute of Technology, and of the effect which the letter from the plaintiff's attorneys to the Institute might have had upon the defendant's education and career. Since, however, this episode had nothing to do with the original execution of the contract, it does not avail the defendant in carrying his burden of proof with respect to the allegations set forth in the counterclaim. The counterclaim, as well as the complaint, must be dismissed.