**DE LONG CORPORATION, Plaintiff,**

v.

**Joseph E. LUCAS, Defendant.**

United States District Court
S. D. New York.

Jan. 27, 1956.

Edward J. Ennis, New York City, for plaintiff.

Watters & Donovan, New York City, for defendant.

McGOHEY, District Judge.

This is an action for injunctive relief and $5 million damages. By order to show cause, which stayed the defendant from proceeding with certain arrangements which the plaintiff seeks permanently to enjoin, the latter moved for an injunction pendente lite.

This is the second time the plaintiff has sued the defendant for identical damages and relief. The present suit is based on the defendant's alleged breach of an agreement executed by the parties on June 10, 1953 in settlement of the first suit.

The essential facts are not in dispute. The plaintiff, a corporation of Delaware, hereafter called DeLong, is engaged in the business of engineering, constructing and installing docks, barges and other over-water structures which, by means of built-in jacks, are self-elevat-

ing. In recent years it has designed and constructed such structures for oil companies and others in the United States and foreign countries, and for the armed services of the United States, here and abroad. At present it holds some, and has pending applications for other patents on devices and methods used in constructing and operating such structures.

The defendant is a citizen of New York. In March, 1950, after several years' experience as a mining engineer, he entered DeLong's employ at a salary of $400 per month. Within a year this amount was increased to $1,000 plus a monthly expense allowance of about $1,500. Moreover, he had access to DeLong's files and gained intimate knowledge of allegedly highly secret and valuable "know-how" of the latter's "jacking devices," their design construction and installation in offshore structures. The terms of employment and compensation, a summary of which follows, are set out in a letter dated May 29, 1952, from DeLong to Lucas, which the latter endorsed. In addition to salary and expenses, Lucas was to receive 25% of DeLong's net profits on a contract secured through Lucas' efforts, for the building and installation of an ore handling wharf at Puerto Ordez, Venezuela; and 20% of any other contract which DeLong might get through Lucas' "specifically authorized, direct and original efforts." Lucas agreed not to divulge trade secrets and confidential information to DeLong's competitors during and for ten years after the employment. Termination of the employment which could be effected by either DeLong or Lucas on thirty days' notice, would not affect Lucas' right to share net profits on contracts secured by him during his employment. In February, 1953, a dispute arose over computation of net profits. Lucas was demanding an accounting but without success. DeLong, on the other hand, was demanding that Lucas assign his then pending application for a patent on a jacking mechanism, which Lucas was withholding until furnished with the accounting. By April, 1953, the rup-

ture became complete and DeLong started the first suit. It was discontinued pursuant to the written agreement executed June 10, 1953.

Under that agreement DeLong was to pay Lucas approximately $135,000 at once, and at a later date the further sum of $50,000. Upon payment of the latter sum Lucas was to assign his pending patent application and any improvements thereon. The two payments and the assignment have been made. Lucas further agreed "for a period of two (2) years after the signing of this Agreement not to compete or assist anyone to compete with [DeLong] in any business related to [Lucas'] former employment by [DeLong] consisting of engineering and sales of docks, barges, platforms and similar equipment for marine and/or oil field use including equipment making use of self-elevating mechanisms, pneumatic, mechanical, manual or otherwise any place in the world"; and "for a period of two (2) years after the signing of this Agreement not to divulge to any one any trade secrets or confidential information concerning the business of [DeLong] learned by [Lucas] during his employment."

It was further agreed "that failure of either party to carry out his or its obligations under this Agreement will constitute immediate and irreparable damage to the other party not compensable in money damages and will warrant preliminary and other injunctive and equitable relief upon a showing of the failure to carry out any such obligation satisfactory to the court to which application for relief may be made."

The present complaint was filed November 12, 1955. Two days previous DeLong had failed in its bid for a contract with the Navy to construct and install a number of advance warning radar stations at sea. The successful bidder was Morrison-Knudsen Company, Inc. of Boise, Idaho, a well known construction contractor. The bids were received some time in September, 1955, in response to invitations issued in July, 1955. DeLong claims that for several months during

the "no competition" period which ended on June 10, 1955, Lucas, by activities shortly to be related and which he admits, was not only himself competing, but was assisting Morrison-Knudsen to compete, with DeLong. It is also claimed that three applications for patents which Lucas filed in 1954 are mere improvements on the patent assigned to DeLong under the settlement agreement and that failure to assign violates that agreement. DeLong seeks permanently to enjoin Lucas: "a. From taking any action, either alone or in concert with Lucas Marine Drilling Co., Inc., Continental Copper & Steel Industries, Inc., Designers & Planners, Inc., or any other person in furtherance of the construction or use of certain self-elevating mechanisms, airjacks or jacking devices prepared by defendant for use in the installation of two certain radar stations in the Atlantic Ocean or otherwise; b. From carrying out any arrangements commenced prior to June 10, 1955 for competing with plaintiff or assisting others to compete with plaintiff in plaintiff's business upon which defendant was formerly employed by plaintiff; c. From divulging any confidential information or trade secrets of plaintiff learned in the course of defendant's employment by plaintiff."

After settlement of the first suit on June 10, 1953, Lucas applied himself to the study of new designs, equipment and methods of construction and operation for reducing the cost of marine oil field operations in unprotected waters up to 150 to 200 feet deep. These studies continued for more than a year. Between May and August, 1954, he filed applications for three patents. The first, No. 432,543, is described as "Multiple purpose barge and method of use in oil drilling and servicing." The second, No. 444,287, is described as "Cable gripping device for caisson or piling methods." The third, No. 454,098, is described as "Well drilling and servicing barge, including bridge and rig structure and methods." In September, 1954, he sought financial assistance for his studies from Morrison-Knudsen. In January, 1955, the latter put him in touch with Continental Copper and Steel Corporation in order to have detailed working drawings made for the construction of a prototype model of a jack described in his patent applications filed in 1954. The conference with Continental occurred at about the time DeLong received a contract from the Navy to construct and erect an advance warning radar station known as the "Texas Tower" off the New England Coast. At this time also it became known among construction contractors that the Government planned, in the near future, to erect several similar stations at other locations. On April 4, 1955, Lucas placed an order with Continental to construct and test the model of his jack. On April 20, 1955, Morrison-Knudsen by a letter reduced to writing its agreement to finance Lucas' studies and experiments in return for a renewable option to purchase his three patents. On June 10, 1955, the "no competition" period of two years expired. Thereafter followed the Navy's invitation for bids, their submission and the award to Morrison-Knudsen as already related. There is no claim that Lucas either directly or otherwise competed with DeLong on the "Texas Tower" contract or on any other contract prior to June 10, 1955.

Lucas concedes that throughout the "no competition" period he was actively preparing to compete with DeLong as soon as possible after June 10, 1955. As disclosed in his memorandum to Morrison-Knudsen dated April 18, 1955, it was Lucas' purpose to develop what he called the "Lucas System" for constructing and servicing marine oil drilling structures, and immediately after June 10, 1955, but not prior thereto, to solicit major oil companies to use his system. He pointed out to Morrison-Knudsen that he was bound by the "no competition" provision of his agreement with DeLong. He contends that he has faithfully kept that agreement. Whether he did, depends on what the parties meant by "competition" in that agreement.

One of DeLong's attorneys asserted on argument that he understood the "no competition" provision to mean that Lucas could not, even in the strictest secrecy, make any studies or prepare any plans with respect to self-elevating mechanisms or structures. In other words, he was required to put these matters completely out of his mind during the two year period. Another of DeLong's counsel did not go so far as that, but he did contend that Lucas was not free (a) to make application for patents relating to such devices, (b) to consult with others concerning his studies or (c) to construct the prototype model of his jack. Lucas, on the other hand, contends that the "no competition" provision merely required him not to bid against DeLong or assist others to do so on contracts to be let during the two year period.

Lucas' construction seems more likely to be the correct one. I do not so decide, however, since I think determination of that issue should await a trial. However, we now know that it took Lucas more than two years to complete the plans for his proposed system and construction of his jack. If, as DeLong contends, Lucas was required to wait until after June 10, 1955 before commencing his studies, the "no competition" period would, in fact, have been more than four years, instead of two as stated in the settlement agreement. I find it difficult to reconcile that result with the language used by the parties and their competent counsel. A trial may develop evidence to support DeLong's contention but, absent such evidence, I cannot accept his construction as correct.

The relief sought pending trial is as extensive as could be obtained after a full trial. DeLong has been protected by a full stay during my consideration of his claims. After long and careful study of the affidavits and briefs I am far from persuaded that he can ultimately succeed, as he seeks to, in completely eliminating Lucas from applying his professional talents in the field of offshore construction. In view of this, it would not be a sound exercise of discretion to continue the stay or to grant the preliminary injunction.

Since a trial is to be had, I do not pass on DeLong's two other contentions. The first is that Lucas breached the settlement agreement by divulging confidential information. The second is that the three patent applications filed by Lucas in 1954 cover merely improvements of the devices covered by the patent application which Lucas assigned to DeLong in 1953 and must therefore be assigned also. The first contention is without any factual support in the papers before me. The second cannot be passed on without study of all the patent applications. These have not been submitted to me. But if they had, I should still hesitate to pass on them without a full trial.

The motion for a temporary injunction is herewith denied, the stay is vacated and the bond is discharged.

It is so ordered.