**DE LONG CORPORATION, Plaintiff,**

v.

**Joseph E. LUCAS, Defendant.**

United States District Court
S. D. New York.
July 30, 1959.

See also 139 F.Supp. 127.

Edward J. Ennis, New York City, and John L. Ingoldsby, Jr., Washington, D. C. (Clifford Forster, John W. Malley, David E. Varner, of Cushman, Darby & Cushman, Washington, D. C., of counsel), for plaintiff.

Watters & Donovan, New York City (James B. Donovan, John P. Walsh, Esq., Patrick J. Hughes, Thomas A. Harnett; New York City, Harry W. F. Glemser, Washington, D. C., of counsel), for defendant.

FREDERICK van PELT BRYAN, District Judge.

This action is based upon alleged breaches of an agreement between plaintiff and a former employee which was entered into in settlement of prior litigation between them arising out of this relationship.

Plaintiff claims that, in violation of the terms of such agreement, defendant engaged in competition with the plaintiff and assisted others to compete with it, disclosed plaintiff's trade secrets and confidential information to its competitors, and failed to assign to plaintiff certain patent applications covering in-

ventions which the defendant was bound so to assign. Plaintiff also claims that defendant misappropriated to his own use ideas, developments and inventions which were plaintiff's property and with which defendant became familiar by reason of his employment.

Plaintiff seeks an injunction against alleged continuing violations of the agreement, specific performance of its provisions relating to the assignment of patent applications, a direction that the defendant assign to it the ideas, developments and inventions claimed to have been misappropriated, and damages.

Plaintiff DeLong Corporation (referred to as DeLong) is a Delaware corporation engaged in the design, engineering, sale, construction and installation of self-elevating docks, barges, platforms and other over-water structures. These structures are used, among other things, in offshore oil drilling and in the construction of the first "Texas Tower", one of the advance warning radar stations erected by the Navy in the Atlantic off the northeastern coast of the United States. Defendant Lucas, a citizen and resident of New York, had been one of plaintiff's key employees. This court has jurisdiction by virtue of diversity of citizenship.

A prior action in this court between these parties, commenced in April 1953, about the time when Lucas left DeLong's employ, was settled by the agreement in suit dated June 10, 1953. That action was based primarily on an employment contract between the parties dated May 29, 1952. DeLong sought to restrain Lucas from accepting employment with competitors in alleged violation of the employment agreement, and from revealing trade secrets and confidential information imparted to him in the course of his employment, and damages. The action was settled at an early juncture.

By the terms of the settlement agreement DeLong agreed to pay Lucas the sum of $184,547.50 representing the balance due him on account of services rendered to DeLong while he was in De-

Long's employ, the amount of which had been in dispute.

Lucas in turn agreed, in substance, (1) to assign to DeLong all of his rights in a patent application then pending covering a slip jack for use on self-elevating over-water platforms and all improvements thereon, and warranted that the patent application and the drawings, sketches, and written matter concerning it to be turned over to DeLong, contained a "complete description of any and all inventions discovered or invented" by him during the term of his employment in respect of the structures and equipment which DeLong designed and produced; (2) for a period of two years after the signing of the agreement "not to compete or assist anyone to compete" with plaintiff "in any business" relating to his former employment "consisting of engineering and sales of docks, barges, platforms and similar equipment for marine and/or oil field use, including equipment making use of self-elevating mechanisms, pneumatic, mechanical, manual or otherwise, any place in the world"; (3) for such two year period "not to divulge to anyone any trade secrets or confidential information" concerning plaintiff's business learned by him during his employment.

It was agreed that the failure of either party to carry its obligations under the agreement would "constitute immediate and irreparable damage to the other party not compensable in money damages" and would "warrant preliminary and other injunctive and equitable relief" upon a proper showing to the court.

The monies due to Lucas under the agreement were paid him. Lucas executed an assignment to DeLong of his patent application for the slip jack and the inventions covered thereby, and a quitclaim assignment of his right, title and interest "to any invention discovered by me during the term of my employment in respect of docks, barges, platforms and similar equipment for marine and/or oil field use, including equipment making use of self-elevating

mechanisms, pneumatic, mechanical, manual or otherwise". The parties exchanged general releases covering "all claims except those arising under this agreement" and the pending action was discontinued by stipulation.

The instant action was commenced on November 11, 1955, two years and five months after the settlement agreement was entered into.

The complaint contains three counts.

The first alleges in substance that during the two year period covered by the agreement Lucas, in violation of its terms, competed and assisted others to compete with plaintiff, and divulged "trade secrets and confidential information" by (a) forming a corporation to construct and use self-elevating mechanisms in drilling for oil in the Gulf of Mexico, and (b) developing and manufacturing a jacking mechanism for use in connection with bidding by DeLong's competitors on Navy contracts for offshore advance radar warning stations in the Atlantic Ocean and in assisting such competitors in their plans and program to obtain such contracts.

The second count alleges that Lucas filed a patent application for a jacking device which was included within the patent applications assigned to DeLong by the two assignments executed by him pursuant to the settlement agreement, and that he was about to conclude arrangements for supplying this device to DeLong's competitors for the advance warning radar station contracts with the Navy. DeLong amended its complaint at the trial so as to include within the second count two patent applications for drill barges filed by Lucas alleged also to have been included in the terms of the settlement agreement and the quitclaim assignment executed pursuant thereto, and to have been DeLong's property which was misappropriated by Lucas.

The third count alleges that Lucas was entrusted with trade secrets and confidential information in the course of his employment by DeLong which, in violation of his agreement, he divulged and continued to divulge to competitors, including the successful bidder on Navy contracts for the advance warning radar stations.

Each count alleges that DeLong will suffer irreparable damage if it is not given injunctive relief against the continued violations of the agreement complained of.

DeLong seeks an injunction restraining Lucas from (a) taking any action alone or in concert with others to further the construction or use of the jacking devices he allegedly developed, in violation of the agreement, for use in the installation of advance warning radar stations in the Atlantic, or otherwise, (b) carrying out any arrangements for competing or assisting others to compete with DeLong, and (c) disclosing trade secrets or confidential information acquired in the course of his employment by DeLong. DeLong also asks that the decree require Lucas to assign to it the United States patent applications on the slip jack and drill barges referred to in the second count, and any and all foreign patents and patent applications based thereon. DeLong further seeks damages of $5,000,000.

The answer, in substance, denies that Lucas either was the recipient of or disclosed any trade secrets or confidential information, or that he competed or assisted others to compete with DeLong in violation of his agreement. It is alleged, in substance, that the slip jack and drill barges which Lucas developed were essentially different from those used by DeLong, were newly invented by Lucas, and were not included in the assignments which he executed pursuant to the agreement. In any event, it is claimed that these inventions were completed only after the two year no-competition period had expired and that any negotiations for their sale or use were not in any way subject to or covered by the agreement.

A motion for a temporary injunction was denied (D.C., 139 F.Supp. 127).

Thereafter the case came on for trial before me without a jury. By that time the two year period during which Lucas had agreed not to compete or to disclose trade secrets or confidential information had long since expired. A number of the claims for injunctive relief therefore had become academic.

However, questions of DeLong's right to the assignment of Lucas' jack and drill barge patent applications remained very much alive, as did DeLong's claim for damages.

The trial was protracted and was made more lengthy and complicated because of the claims of both sides that a large part of the relevant documentary material contained trade secrets. This had blocked much of the normal pre-trial deposition and discovery. Therefore, a great deal of the ground which would normally have been covered by such proceedings was left for the trial itself.

From the evidence adduced at the trial I find the facts to be as follows:

*DeLong's business and background.*

DeLong Corporation was the successor to Decco Construction Company, a corporation which had been in turn the successor in interest to Colonel Leon De-Long, the principal stockholder in each. Colonel DeLong during the war had been Chief Engineer of the Alaska Department of the Army Corps of Engineers. Prior to the war he had for many years engaged in major engineering projects, and from 1935 to 1942 had been general superintendent of construction on various projects for Morrison-Knudsen Company, Inc., one of the largest contracting firms in the United States.

After leaving the service in 1946 Colonel DeLong engaged in marine joint ventures with Morrison-Knudsen. During this period he first met defendant Lucas who was engaged in gold mine dredging operations for Morrison-Knudsen in Alaska.

In 1949, after discussion with one of Morrison-Knudsen's principal engineers with respect to problems of offshore oil drilling, Colonel DeLong and Morrison-Knudsen organized the Marine Contracting Corporation to engage in such operations in the Gulf of Mexico. These operations were of the conventional type then used in the Gulf. Oil drilling platforms over water were constructed by driving piles or caissons into the bed of the Gulf and then lifting a pre-fabricated platform onto them by means of a large derrick affixed to a floating barge. The various oil drilling components, including the oil derrick with rotary table, drill works, motor to operate the rotary table and other units, were then lifted by the derrick onto the prefabricated platform. This method of construction was hazardous and costly due to weather conditions and rough seas. The permanent structure thus erected could be removed only by bringing the derrick barge back to the side and removing the drilling components and platform piece by piece and this was expensive and wasteful.

In September 1949, after friction had developed between Colonel DeLong and Morrison-Knudsen, Colonel DeLong bought out the latter's 51% interest in Marine Contracting Corporation for $400,000. Marine continued operations for a short time but its oil drilling activities along conventional lines lapsed when the decision of the Supreme Court of the United States holding offshore title to be in the United States and not in the States,[1] practically terminated offshore drilling.

In April or May of 1949, however, Colonel DeLong commenced discussions with Robert W. Pointer concerning the development of an improved method of erecting a drilling platform over water to avoid many of the hazards to which the conventional methods were subject. As a result of these discussions the idea was developed of a floating drilling plat-

1. United States v. State of Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216; United States v. State of Texas, 339 U. S. 707, 70 S.Ct. 918, 94 L.Ed. 1221.

form which had a number of caissons affixed which would be let down to the sea floor through openings in the platform but which would project above the deck of the platform when resting on the bottom. The platform would be raised above the water on these caissons by a jacking device and would then be firmly fixed to the supporting caissons at a sufficient height above the water to avoid destructive wave action. Upon the completion of drilling operations a small permanent producing platform supporting the pumping equipment could be erected at the site and the drilling platform could be lowered down the caissons to the water level by means of the jacks and the caissons could be raised from the sea floor. The drill barge could then be towed to a new location and drilling operations resumed there by the same methods. If the hole were dry the same procedure could be followed and the well abandoned.

Successful tests were made with the holding qualities of a rubber gripper for use on such jacking mechanisms in September 1949. DeLong then invested some $100,000 in the development with Pointer of a jacking mechanism for raising and lowering the drill barge on the caissons under an agreement by which DeLong paid the expenses and Pointer did the principal development work. Pointer was to take out a patent on the device which he would own in equal shares with DeLong. On February 11, 1950, Pointer filed his original patent application for this jacking device (No. 143,627). The original application was continued in part by a second application of April 22, 1952 (No. 283,567) which was granted on January 1, 1957 (Patent No. 2,775,869).

Six prototype Pointer jacks, using rubber grippers, were then manufactured and in February or March of 1950 were assembled at the Alexander Shipyard in New Orleans, Louisiana.

### Lucas' background and his association with DeLong.

Defendant Lucas, while not a professionally trained engineer, had a broad practical engineering experience. He had worked with Morrison-Knudsen and others on major engineering projects for a number of years. He had considerable engineering skill and ingenuity and had obtained patents on inventions in the hydraulic dredging and drilling fields. In 1949 he was working with west coast oil companies on drilling problems.

Late in 1949 Colonel DeLong discussed with Lucas the possibility of working with him in the development of his scheme for self-elevating offshore drilling platforms and particularly in the development of the new jacking mechanisms. As a result Lucas joined DeLong in February or March of 1950 under an arrangement by which he was to be paid $1,000 per month and expenses. Colonel DeLong also promised to work things out so that he would have an interest of some kind in the project.

### DeLong activities subsequent to the Lucas association and Lucas' participation in them.

By the time Lucas had joined the DeLong organization the first six prototype Pointer air jacks had been completed and they were tested on a floating drill barge equipped with caissons in the New Orleans yard. Lucas participated in these tests, which, despite some difficulties, were successful in raising the drill barge platform above the water, supported on caissons, by the use of the jacking mechanisms.

Lucas then visited various major oil companies engaged in offshore operations to interest them in the project and commenced work with Preston, an engineer employed by him on DeLong's authority to work on improvements to the scheme. These included a self-energizing slip jack to raise and lower the drill barge on the caissons as an alternative to the Pointer air jack using rubber grippers. Drawings of such jack were prepared.

DeLong's activities were then curtailed for a considerable period. During this period, and until January 1951, Lucas was paid $400 a month on a standby basis when he resumed his activities and his full salary.

In the meantime, in September 1950, DeLong had constructed a drill barge for the Magnolia Oil Company with Pointer air jacks to operate the caissons. The barge was satisfactorily tested. In January 1951 Colonel DeLong, through DeLong Engineering and Construction Company, another of plaintiff's predecessors, sought a contract for the design, engineering and installation of a dock at the secret jet bomber base at Thule, Greenland. This was to be installed by the DeLong system of jacking a floating platform above the water on caissons resting on the bottom and using it as a permanent dock installation.

Demonstrations of the operation of the Magnolia barge were successfully conducted at Orange, Texas. They were attended by Army officials, the prime contractor at the Thule base, and oil company representatives. The DeLong organization obtained the Thule dock installation contract from the Army at a contract price of $3,100,000.

Lucas conducted these tests on behalf of DeLong and worked closely with Suderow and Tate, other DeLong engineers in the development and design of the jacking mechanisms, barges and docks for the Greenland job and the final testing of this equipment. In July 1951 Lucas was directing the operation of the jacking mechanisms at Thule, Greenland, where the dock was being installed. The dock was raised on caissons by the DeLong system and installed in thirty days with a crew of twenty-three men. It was estimated that conventional methods of installation would have required six months and a crew of two hundred.

After successful completion of the Thule job, DeLong, in February 1952, commenced negotiations with the Army Transportation Corps for a number of "package ports" consisting of floating docks, and jacks for elevating them on caissons, to be used for landing troops and supplies on shores where no conventional docking facilities existed. Lucas collaborated in the development work and the preparation of estimates on this contract and on improvements in the methods and equipment previously used in the light of the Greenland experience. In February 1952 DeLong obtained a contract from the Transportation Corps for two hundred forty-four air jacks and a series of "package ports" for approximately $16,000,000.

In the meantime Lucas had brought the DeLong organization into contact with Orinoco Mining Company. As a result, in February 1952, DeLong obtained a contract from Orinoco for the installation of a dock on the Orinoco River in Venezuela to be used for the shipment of iron ore. This involved the same methods which had been successfully used in Greenland. Lucas was in charge of this project, worked out the designs and plans and supervised the earlier portion of the work which was also successfully completed.

Up to November 1952 Lucas had had no formal written contract with the DeLong organization. In June of 1952, after Lucas had requested that his arrangements with DeLong be formalized, a proposed contract of employment was sent him. After considerable hesitation Lucas executed this contract on November 17, 1952. It covered Lucas' employment by DeLong from March 1, 1950. Under its terms Lucas was to receive $1,000 per month and expenses, 25% of the net profits on the Orinoco contract, and 20% of the net profits of any other contracts brought in solely through his efforts.

Lucas agreed that he would not divulge any DeLong trade secrets, that inventions or processes invented or devised by him in connection with his employment would be the property of DeLong, and that, during his employment and for a period of ten years thereafter, he would not compete or assist anyone to compete with DeLong "in the phases of DeLong's business involved in [his] employment". The agreement recited that "in consideration of these warranties you have been

entrusted with vital information concerning the air jack and other secret designs and processes related to your employment and have been permitted and encouraged in assisting in the further development thereof".

Colonel DeLong at the same time executed a separate written guarantee that Lucas' share of the Orinoco contract would be a minimum of $150,000.

Lucas was relieved of responsibility for the Orinoco River job in the fall of 1952 before it was completed. He then engaged in the promotion and sale of the DeLong system for offshore oil drilling.

However, in the spring of 1953 disputes arose as to payment of the amounts due Lucas as his share of the net profits of the Orinoco contract, and his relations with the DeLong organization deteriorated. In the middle of March 1953 Lucas went to the Pacific Coast, still on his DeLong expense account, and talked to a number of people concerning the use of the DeLong system for offshore oil drilling there. Apparently Colonel DeLong became suspicious that Lucas was carrying on some of these activities for his own benefit rather than for the benefit of DeLong. As a result, on April 22, 1953, DeLong brought the prior action which resulted in the settlement agreement of June 10, 1953, now in suit. Lucas was paid no salary after February 1953 and his employment appears to have terminated some time shortly before the commencement of that action.

Thus, for a period of some two years Lucas had been a trusted key employee of the DeLong organization and was intimately familiar with its business and operation. Lucas had a share in the profits of the Orinoco contract and was to receive some $200,000 on that contract in addition to a substantial salary. He also had an interest in other contracts which he might bring in.

The sole business in which DeLong was engaged was the design, engineering, construction and installation of docks, barges, platforms and other over-water structures. The methods used in constructing and installing these structures over water on caissons by means of jacking mechanisms had been developed exclusively by the DeLong organization. The DeLong methods and equipment were unique in the field. These installations required great skill and extensive practical experience and technical knowledge. The system had been developed by DeLong from scratch and had proven to be highly practical and successful.

An important phase of the DeLong business involved obtaining patent protection for the various features of the system as it was developed. Both the Pointer air jack and the slip or wedge jack developed by Lucas in the course of his employment were the subject of patent applications, and the latter was assigned to DeLong under the terms of the settlement agreement in suit. Patent development work was also carried on by the DeLong organization on various types of barges carrying oil drilling equipment to be self-elevated by use of jacking mechanisms. Patent protection of the various components of the system was plainly important to the enterprise.

There is no doubt that Lucas was fully abreast of the patent development work carried on by the DeLong organization during his employment, both with regard to the jacking mechanisms and with regard to drill barges. Lucas himself had developed and arranged for the filing of patent applications in his own name on the slip jack which he assigned to DeLong. He was closely concerned with the drill barge developments and familiar with their details. When he terminated his employment Lucas was thoroughly familiar with all phases of the DeLong business in the design, patenting, engineering, construction and installation of over-water platforms resting on caissons and raised above the surface by self-elevating jacking mechanisms.

*DeLong's activities subsequent to the settlement agreement of June 10, 1953.*

Subsequent to the execution of the settlement agreement the DeLong business

in these fields continued to develop and expand.

In 1953 and 1954 DeLong, in a joint venture with others, developed and built mobile drilling barges in the Gulf, using the DeLong system and methods, one at a cost of $1,250,000, and another costing $4,250,000. The decision of the Supreme Court in 1953 upholding the Submerged Lands Act of 1953, 43 U.S.C.A. § 1301 et seq.,[2] which ceded lands below navigable waters to the States, had given new impetus to developments in the offshore oil drilling field. Four additional drilling barges of the DeLong type were also constructed.

In late 1953, or early 1954, the Bureau of Yards and Docks of the Navy made inquiries of DeLong as to the possibility of constructing one of the projected advance warning radar stations in the Atlantic Ocean off the northeast coast by the use of the DeLong system and methods. In May 1954 DeLong was awarded a contract to take core samples of the ocean bed for the purpose of determining the soil characteristics of suitable sites for establishing such a station. DeLong had first submitted to the Navy drawings and designs of the type of structure which it proposed.

The core drilling operation was conducted from one of the barges previously purchased from DeLong by the Army Transportation Corps. These operations were completed by DeLong in July 1955 and reports were made to the Navy thereon.

Negotiations with the Navy for the construction of the first of the advance warning radar stations then progressed. This station was designated by the Navy as "Texas Tower No. 2". The term "Texas Tower" was derived from the over-water oil drilling platforms in use in the Gulf of Mexico. At that time four of such towers were projected by the Navy off the northeast coast. The site of Texas Tower No. 2 was on Georges bank 110 miles off Cape Cod in some eighty feet of water. DeLong, in a joint venture

with Raymond Concrete Pile Company, obtained a negotiated contract for Texas Tower No. 2 from the Navy early in 1954.

The structure consisted of a platform raised above the surface of the ocean to support the complicated radar warning equipment and to house the crew tending it. The platform was supported by caissons resting on the ocean bottom. It was constructed at the Bethlehem Shipyard in Quincy, Massachusetts, and towed to the site. The caissons were let down to the ocean bed through openings in the platform. The platform was then jacked up to the required height above the surface of the ocean by the use of the DeLong jacking mechanism. It was secured and became a permanent over-water structure. The method of construction was substantially the same as that which had been pioneered and developed by DeLong in its other enterprises in this field.

Work on the platform for Texas Tower No. 2 commenced early in January 1955. The caissons, jacks and other erection equipment was installed on the platform in June 1955, it was towed to the site, and erection was completed in December of that year.

The successful completion of Texas Tower No. 2 was a major engineering achievement. It was based on the unique methods, devices and equipment which DeLong had developed, and required great technical skill and experience. During the course of the work the DeLong-Raymond joint venture acquired a wealth of practical knowledge and experience. The venture organized a staff of trained personnel for this work who were well equipped to carry it on. The venture was ready and anxious to obtain the contracts for the additional Texas Towers projected by the Navy.

In September 1955, while work on Texas Tower No. 2 was still going on in the North Atlantic, the Navy called for bids on three additional Texas Towers to be submitted on November 1, 1955. A second DeLong-Raymond Concrete Pile joint venture worked up a bid on all three

---

2. State of Alabama v. State of Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689.

towers individually, in combination and overall. Its bids on the combination of Texas Towers 3 and 4, which were the only towers on which the Navy let contracts, amounted to $16,890,157.

However, DeLong-Raymond was not the successful bidder. Upon the call for bids Morrison-Knudsen Corporation, with which DeLong had previously been associated, formed a joint venture with J. Rich Steers, Inc. for the purpose of bidding on these contracts. Morrison-Knudsen was a very large contracting firm of wide interests which had constructed major engineering projects in many parts of the world. J. Rich Steers, Inc. were also well known contracting engineers. This joint venture also submitted bids on all three towers individually, in combination and overall.

The Navy, upon the opening of bids, determined that contracts would be let only for Texas Towers Nos. 3 and 4. The Morrison-Knudsen-Steers bid on the combination of Towers 3 and 4 was $16,431,000, some $459,000, or less than 3%, below the DeLong-Raymond bid for this combination. The Morrison-Knudsen-Steers bid was therefore accepted by the Navy on November 10, 1955 and DeLong-Raymond lost this large contract for work on which DeLong had pioneered.

On November 11, 1955, immediately after the award of these contracts to their successful competitor, DeLong commenced the present suit against Lucas.

There is no question but that the loss of the Texas Tower contracts to Morrison-Knudsen-Steers was the precipitating cause of this litigation. For it is DeLong's claim that Morrison-Knudsen was enabled to outbid it on these contracts and to obtain them against the DeLong-Raymond competition only because of the activities of Lucas and the assistance rendered to Morrison-Knudsen by him during the two year no-competition period provided by the settlement agreement of June 13, 1953, in violation of that agreement.

Attention must therefore be turned to the activities of Lucas during this period.

*The activities of Lucas subsequent to the termination of his employment by DeLong.*

Lucas had met and talked with Morrison, the President of Morrison-Knudsen, and Kennedy, its Vice President in charge of South American operations in Venezuela in 1952, while he was supervising the Orinoco River job for DeLong. Morrison-Knudsen was interested in the possibilities of entering the field in which DeLong was engaged and of using Lucas and his knowledge and talents in that connection. In December 1952 and January 1953 Morrison-Knudsen executives, in correspondence between them, expressed interest in offshore drilling operations by methods similar to those used by DeLong. Their correspondence indicated that there was a good opportunity to work out a deal with Lucas through which "our company could make some money". It was suggested that contacts might be made with Lucas "to follow up on this business".

In March of 1953 Lucas went to Boise, Idaho, the headquarters of Morrison-Knudsen Corporation, and talked with several of their executives. It may fairly be inferred that these talks were a continuation of previous conversations and dealt with the field of over-water structures and the possibility of his assisting Morrison-Knudsen in this field. At that time Lucas was still on a DeLong expense account and his relationship with DeLong had not been terminated.

Shortly after the execution of the settlement agreement of June 10, 1953, Lucas obtained a contract for the installation of channel markers and navigational aids on the Orinoco River in Venezuela. This contract did not involve methods or equipment similar to those used by DeLong and concededly did not violate the no-competition clause in the settlement agreement. Lucas gave his principal attention to this job until his return to the United States early in 1954. It was successfully completed at a profit to him of some $300,000.

However, on July 25, 1953, Lucas had sent to his patent counsel in the United States rough pencil sketches of a cable jack for use on self-elevating mechanisms based on the Chinese finger-grip principle, which is one of the principal subjects of controversy here. During this period he also gave considerable study to the development of drill barges and drill barge equipment paralleling or overlapping those developed and in use by DeLong.

Beginning in April 1954 Lucas kept closely in touch with Kennedy at the Morrison-Knudsen office in New York and Kennedy was kept informed of his plans and developments in connection with self-elevating over-water platforms and his cable jack mechanism. Financing was discussed for the Lucas cable jack, a United States patent application for which was filed by Lucas on July 15, 1954. Lucas also filed patent application for a multi-purpose derrick barge on May 26, 1954 and an application for a similar barge on September 3, 1954. Both used methods similar to those developed and in use by DeLong and were to be used for the same purposes.

In August 1954, at Kennedy's suggestion, Lucas went to San Francisco and discussed his projected oil drilling barges and jacking devices with Dunn, Vice President of Morrison-Knudsen and President of one of its engineering subsidiaries. He had already sent Dunn drawings of various of such devices.

Dunn had worked with Colonel DeLong in 1948 and 1949 on offshore drilling platforms before DeLong had severed its connection with Morrison-Knudsen and before it had developed its new methods of raising over-water structures by self-elevating mechanisms.

By the time of Lucas' visit to the west in August 1954 the projected construction by the Navy had become known to Morrison-Knudsen and Morrison-Knudsen had expressed interest in the work. It had also manifested interest in offshore drilling in the Gulf by methods and devices being developed by Lucas similar to those in use by DeLong.

There was lively discussion among the Morrison-Knudsen executives on these subjects and on the desirability of making some arrangements with Lucas so that Morrison-Knudsen could utilize him on development work in these directions.

By this time, as a result of conversations with Morrison, the President of Morrison-Knudsen, and Kennedy, Shinn and Dunn, executives of that organization, Lucas had solicited Morrison-Knudsen's help and given them a first refusal to participate in and contribute financial and technical help to the development of the so-called Lucas system comprising his cable type jack, his multi-purpose derrick barge and his well drilling and servicing barge for which patent applications had been filed.

These patent applications had been studied by Dunn and his staff, who were of the view that they were practical and economical.

On September 4, 1954, Bonny, one of the executives of Morrison-Knudsen, wrote an interoffice memorandum to Morrison stating that Lucas was anxious to work out an arrangement to secure sufficient financing to make a prototype of his jack, and that arrangements were being made for a meeting with Lucas in Boise on September 14 to determine whether Morrison-Knudsen should go further with the scheme. The memorandum noted that there were a number of large projects to be constructed for offshore radar and nike stations on the Atlantic Banks proposing to use a similar platform and "an association where we would offer a platform would no doubt be desirable". He also discussed the possibilities in the offshore drilling field and closed by saying "In any event I believe, in view of the possible prospects, particularly with the Corps of Engineers (relating to the offshore radar stations) we should give serious discussion to Lucas before passing it up".

On September 14, 1954, the meeting with Lucas was held in Boise, Idaho, in the Morrison-Knudsen board room, attended by Morrison, Bonny, Kennedy,

Zapp (counsel to Morrison-Knudsen), another of its executives, and Lucas. No memorandum was immediately made of the discussions at that meeting. But on April 18, 1955, Lucas prepared and sent to Morrison-Knudsen a memorandum which, among a number of other things, outlined the discussions and decisions reached at that conference. Lucas proposed a seven point program, five steps of which were to be accomplished prior to July 1, 1955. The first five steps included independent engineering studies of the effect of wind velocities and waves on the proposed structures; study of the design requirements of the proposed structures in various depths of water in various sea bottom conditions with necessary soil mechanics studies, development of data on the efficiency and economies made possible through the use of the proposed methods and designs; designing, building, testing and perfecting a full-scale prototype cable jack; and, if the jack design proved sound, and engineering and designing of a prototype drill barge using the Lucas jacks to raise the barge above the water. The last two steps consisted in filing the patent applications, already filed with the United States Patent Office, in all foreign countries having marine oil production potential, filing applications of any new inventions that might be developed, and offering the major oil companies a complete and comprehensive marine and oil field service to include all of the Lucas devices and methods.

Costs and financing in the sum of two million dollars were discussed. At the conclusion of the September 14 meeting the Board of Directors of Morrison-Knudsen authorized the expenditure of $100,000 for preliminary financing, including the reimbursement of Lucas' expenses and maintenance while away from Caracas. The $100,000 was to be expended principally for the development of Lucas' cable jack device and the construction of a prototype.

Prior to the Boise meeting Lucas had hired Duncan, an engineer who had been executive chief engineer of the company which built the DeLong jacks for the Greenland structure, to make a feasibility study of his jacking and drill barge devices. In late September 1954 Duncan sent Lucas a report dealing with his proposed offshore drilling methods, and analyzing his patent applications for drill barges and a cable type jack, a copy of which was sent to Morrison-Knudsen. The report made a comparison with the DeLong jacks which it said worked "on a principle parallel to subject jacks". Lucas continued to use Duncan's services, and on January 4, 1955, employed him to continue work on the projects at $1,000 a month plus expenses.

With the Morrison-Knudsen financing behind him Lucas proceeded to employ the engineering firm of Tippet, Abbott, McCarthy and Stratton to make wave, wind and soil mechanic studies and a feasibility report on his drill barges, and the engineering firm of Designers and Planners, Inc., to prepare designs for his prototype cable jacking mechanism. During the late winter and spring of 1955 these firms were actively engaged in this work. By April 18, 1955, Lucas had expended some $36,450 of the funds authorized by Morrison-Knudsen. This was in addition to some $20,000 which he had expended on his "system" prior to the September 14, 1953, meeting. It may be noted that all of the work to be paid for by Morrison-Knudsen was discussed with Kennedy of that firm and his approval obtained before any commitments were made.

In January 1955 Lucas commenced negotiations with Continental Copper & Steel Industries, Inc., for the fabrication of a prototype of his cable jack. Morrison-Knudsen had a small interest in Continental Copper and had put Lucas in touch with them. During the next short while Designers and Planners worked intensively on drawings to be used in the fabrication of the jack with Duncan, whom they provided with office space. Tippet, Abbott, McCarthy and Stratton continued its work on wind, wave and feasibility studies and Continental Cop-

per undertook the fabrication of the prototype of the Lucas jack.

In the meantime Morrison-Knudsen had become more actively interested in the projected construction for the Navy of the Texas Towers in the North Atlantic. Prior to January 21, 1955, a representative of Morrison-Knudsen had conferred with the Navy Department with respect to the possibilities of Texas Tower construction and supplied them with radar data to enable them to revise their "oil well platform to fit radar requirements". A further conference was called on February 10, 1955. Dunn of Morrison-Knudsen stated in a memorandum to Morrison, its president, in that connection, "We are not yet putting out any sales effort—the biggest customer seems to be coming to us". There was discussion as to the use of Lucas "to assist in getting a tower built as a basis of cost and information which would presumably be helpful for further work". There were further discussions with the Navy Bureau of Yards and Docks looking toward securing the contracts for the proposed offshore advance warning radar stations. It is plain that Morrison-Knudsen intended to use the Lucas jack which it was financing "to bid on the Navy towers or use it for oil platforms".

Lucas' memorandum of April 18, 1954, to Morrison-Knudsen reviews the steps which had been taken by Lucas pursuant to the arrangements made on September 14, 1954, up to that time. Among other things, it describes what had been done to secure patent protection, including the filing of the three United States patent applications by Lucas, and the filing of similar applications in all foreign countries having offshore oil potential. This work was completed in January 1955 with Kennedy's approval. Lucas stated that "This is part of the strategy of building a 'patent fence' around the use of this system". Annexed to the memorandum was a proposed agreement between Lucas and Morrison-Knudsen with respect to these developments, drafts of which had been under discussion since the first part of October 1954.

This agreement was executed by Morrison-Knudsen on April 20 and was "a finalization" of the objectives which had been agreed upon. Under the terms of the agreement Morrison-Knudsen was given an option to purchase Lucas' inventions relative to his "system", to make available the sum of $100,000 previously committed for development work, $36,500 of which was to be applied to reimburse Lucas for prior expenditures. Lucas was to devote the major portion of his time "to design and development work, the advancing of patent rights and the promotion of future sales". Lucas was given an additional year in which to complete his development, and Morrison-Knudsen was permitted to extend the development period for an additional year by agreeing to advance such additional funds as might be reasonably necessary for its continuance. Morrison-Knudsen agreed to pay to Lucas 10% of any profits realized or stemming from the use or operation of any of Lucas' patents, methods or systems, and 10% of any funds eventually realized as income from or proceeds of the sale of such devices. Lucas also was to receive a 10% ownership interest in any entity making use of his patent rights. If Morrison-Knudsen exercised its option Lucas was to enter the employ of Morrison-Knudsen, or its appointees, as executive officer in charge of any operations relative to the use of the Lucas system, at a salary of $2,000 per month plus expenses.

Morrison-Knudsen considered the Lucas arrangements a matter of substantial value to it for in May and early June 1955 it was discussing insuring Lucas rather heavily as a partial protection of its investment since "if something should happen to him it would probably be more than usually difficult to replace him", particularly in connection with its offshore platform program.

By June 10, 1955, the expiration of the period of no-competition provided in the DeLong-Lucas settlement agreement, the preliminary work on the cable jack had been completed. Designers and Planners, with the help of Duncan, had virtually

completed the drawings and designs on the prototype. Tippet, Abbott, McCarthy and Stratton had submitted the first of its wind and wave studies relating to the barges and platforms on June 2. Arrangements for fabrication of the prototype jack had been made with Continental Copper & Steel. Lucas was prepared to proceed with the actual fabrication of the prototype jack which was commenced shortly thereafter.

Intensive work along these lines continued. By August 1955 the construction of the prototype jack had been completed by Continental Copper at Holyoke, Massachusetts, and the jack had been tested in the presence of Lucas and representatives of Morrison-Knudsen.

### The successful Morrison-Knudsen-Steers bid on Texas Towers Numbers 3 and 4.

On September 9, 1955, the Navy Department formally released its invitations to bid on the three additional Texas Towers which had been under discussion for almost a year, and toward which the work being done by Lucas for Morrison-Knudsen had been pointed. The bids of the Morrison-Knudsen-J. Rich Steers joint venture on the additional Texas Towers 1, 3 and 4, and the estimates upon which they were based, were prepared by Colonel Herb of Morrison-Knudsen and Lucas who worked together on them. Lucas' concern was principally with the estimates for the Lucas jack which was a key feature of the whole project. All of the estimates were based on the estimated cost of the Lucas jacking mechanism worked up and supplied by Lucas, and based in large measure on the development work which had been done during the no-competition period.

These estimates were included in the successful bid of Morrison-Knudsen of $16,431,000 for Texas Towers Nos. 3 and 4 which, as has been pointed out, was only some $459,000, or less than 3% below the DeLong-Raymond bid for this combination.

A few hours before the bids were opened on November 1, 1955, an agreement was executed between Lucas and Morrison-Knudsen which provided for the use of the "Lucas system" in the construction of the Texas Towers for 10% of the profits, with advance royalties of $2,000 a month. This agreement makes it plain that Morrison-Knudsen-Steers intended to use the Lucas jacks in the performance of the Texas Tower contracts when the bids were submitted, and that the bids were based on such use.

In fact, the Lucas jacks were not used by Morrison-Knudsen-Steers in the performance of the contract, and in January 1956 it was decided to use the Roebling jack instead. But this is no indication that Morrison-Knudsen-Steers did not intend to use the Lucas jacks when the bids were submitted, or that the bids were not based thereon. The abandonment of the Lucas jack and the decision to use the much more expensive Roebling jack came about because of the commencement of the present action on November 11, 1955, the day after the contract was awarded to Morrison-Knudsen-Steers and the issuance of the temporary restraining order by this court on the plaintiff's motion for a preliminary injunction.

In making its bid on the combination of Texas Towers Nos. 3 and 4, the Morrison-Knudsen-Steers joint venture relied principally upon the detailed estimates for Texas Tower No. 3 prepared by Herb and Lucas. The estimates for Texas Tower No. 4 were overall estimates based on the detailed figures used on Tower No. 3, with appropriate alterations for differences in specifications and construction. The bids contemplated that the same jacks were to be used both on Texas Tower No. 3 and Texas Tower No. 4. Thus, on the successful combined bid covering both towers there was no need for duplication of this item.

The figure of $490,000 was included in the estimate on Texas Tower No. 3 for the Lucas jacking mechanism and for three outriggers and six caissons. The outriggers and caissons were estimated at $242,000 and were not a part of the jacking mechanisms and their hydraulic and control systems. Thus, the cost esti-

mate of the Lucas jacking mechanism on Texas Tower No. 3 was $248,000. On the combined bid for Texas Tower No. 3 and Texas Tower No. 4 this same figure was used for both without duplication. The addition of $72,000 in the Texas Tower No. 4 estimate for three extra brackets not needed on Texas Tower No. 3 were not a part of the cost of the jacking mechanism and did not affect such cost.

In the course of preparing its bids Morrison-Knudsen-Steers had secured quotations on two other jacking mechanisms for possible use on the project. Both of these, the Roebling jack and the McKiernan-Terry jack, were untested and the Roebling jack, at least, had never before been used.

The quotation obtained for the Roebling jacks was $757,000 for both towers, compared with $248,000 for the Lucas jacks, or some $509,000 above the estimate for the Lucas jacks used in the bid submitted. The McKiernan-Terry jacks were quoted at $1,100,000 for both towers, or $852,000 above the estimate for the Lucas jacks. These were only cost figures to the joint venture and did not include any upward revisions of profit or overhead which would normally be added over and above actual cost increase.

As has been pointed out, the difference between the successful bid of the Morrison-Knudsen-Steers venture on Texas Towers Nos. 3 and 4, and the unsuccessful bid of the DeLong-Raymond venture was very narrow and amounted to only $459,000 out of bids in excess of $16,000,000. Had the Roebling or the McKiernan-Terry jacks been used by Morrison-Knudson-Steers as the basis for estimating its bid instead of the Lucas jacks, the Morrison-Knudsen-Steers bid would have exceeded the DeLong-Raymond bid on the basis of the cost figures of the jacking mechanisms alone, quite apart from any further increase for additional profit or overhead. This would be so even if the figure of $278,000 which defendant claimed was the estimated cost of the Lucas jacks were accepted by me. However, I do not accept that figure as cor-

rect since it is belied by the actual estimates.

It was the work done by Lucas on behalf of, and with the financing of Morrison-Knudsen in developing and designing his jacking mechanism so that a prototype could be constructed and tested which made it possible for Morrison-Knudsen-Steers to base its bid on the estimates of the Lucas jack. Moreover, the special knowledge and experience of Lucas regarding the operation of the jacks and the problems to be anticipated arising out of their operations also was an additional factor in making the use of such estimates possible. Lucas had been working on these problems for Morrison-Knudsen for many months prior to the expiration of the no-competition period on June 10, 1955.

The use of these estimates, made possible by Lucas' work during the no-competition period, enabled Morrison-Knudsen-Steers to outbid the DeLong-Raymond joint venture on Texas Tower No. 3 despite the wealth of experience which DeLong had acquired in the Texas Tower No. 2 project.

This was the reason why the DeLong-Raymond venture failed to be awarded these profitable contracts which it otherwise would have received.

### I.

*The violation of the covenant not to compete.*

The first major issue presented for decision is whether, as DeLong contends, the acts and conduct of Lucas during the two year no-competition period provided in the settlement agreement of June 10, 1953, were in violation of the no-competition clause and constituted a breach of the agreement.

By the agreement of June 10, 1953, Lucas agreed:

"(b) For a period of two (2) years after the signing of this Agreement not to compete or assist anyone to compete with the First Party in any business related to the Second Party's former employment by the First

Party consisting of engineering and sales of docks, barges, platforms and similar equipment for marine and/or oil field use including equipment making use of self-elevating mechanisms, pneumatic, mechanical, manual or otherwise any place in the world."

There is no doubt that negative covenants by an employee not to compete with his employer when he leaves employment are no longer void per se but are held to be invalid only if they are unreasonably in restraint of trade. Whether such an agreement is unreasonable may be determined by weighing the competing interests of the employer and the employee and giving due consideration to the interests of the public. An employee's covenant not to compete is not unreasonable and will be enforced if (1) it is necessary for the proper protection of the employer's competitive position, (2) its impact upon the former employee is not such as to restrict unduly his opportunities for making a livelihood and (3) is not unreasonably restrictive in its impact upon the public. Harrison v. Glucose Sugar Refining Co., 7 Cir., 116 F. 304; Arthur Murray Dance Studios of Cleveland v. Witter, Ohio Com.Pl., 105 N.E.2d 685; Universal Winding Co. v. Clarke, D.C.Conn., 108 F.Supp. 329; McCall Co. v. Wright, 198 N.Y. 143, 91 N.E. 516, 31 L.R.A.,N.S., 1249; Eastman Kodak Co. v. Powers Film Products, Inc., 189 App.Div. 556, 179 N.Y.S. 325; New York Wet Wash Laundry Co. v. Unger, 170 App.Div. 761, 156 N.Y.S. 598; Eastern New York Wet Wash Laundry Co. v. Abrahams, 173 App.Div. 788, 160 N.Y.S. 69; Eagle Pencil Co. v. Jannsen, 135 Misc. 534, 238 N.Y.S. 49; 6 Corbin on Contracts, § 1394. Cf. Guth v. Minnesota Mining & Mfg. Co., 7 Cir., 72 F.2d 385.

DeLong had developed and established a unique business in the highly specialized field of self-elevating overwater structures. Lucas, with no previous knowledge of that field, entered DeLong's employ and remained for some two years in a key position. He participated in the development and expansion of DeLong's business at a crucial period. He acquired a wealth of practical experience and technical knowledge concerning the plaintiff's equipment, methods and operations, and was familiar with the highly confidential aspects of the DeLong business, including the developments to overcome practical problems encountered on various projects in which DeLong had been engaged. Moreover, he knew that DeLong was taking steps to acquire patent protection for its equipment and methods and was familiar with the details of the design and practical operation of its development program.

Lucas was no minor employee engaged in routine tasks. He was well paid and had in addition a substantial stake in the profits of ventures which he himself brought in. Indeed, on the Orinoco job alone he had been paid some $200,000 as his share of the profits.

Prior to his employment by DeLong, Lucas had virtually no experience in the field to which DeLong was principally devoting its efforts. Whatever skill and knowledge he acquired in that field (and they were not inconsiderable) were acquired as a result of his employment in a position of trust.

The period of the restriction was short and corresponded to the period of Lucas' employment by DeLong. The restriction applied only to the limited, and at that time unique, field in which DeLong was engaged. Lucas was free during the no-competition period to employ his engineering and business skills freely except in the narrow and limited field of DeLong's activities. Evidence of his ability to do so was his successful completion of the contract for dredging and installation of markers on the Orinoco River, which he undertook and successfully completed immediately after the settlement agreement had been entered into and the no-competition period had commenced, and which netted him a profit of some $300,000.

While the geographical area of the restriction was world-wide, the field of restriction was so narrow as to constitute

but an insignificant fraction of the engineering field generally. It in no way restricted Lucas from engaging in any one of a variety of undertakings in that field such as he had been engaged in before his employment by DeLong and successfully engaged in immediately after such employment had come to an end.

The covenant not to compete was freely entered into after his employment had terminated for a valid and substantial consideration.

Under these circumstances it would be in the public interest to have the fruits of DeLong's ingenuity, skill, enterprise, industry and capital investment protected against competition by Lucas in this restricted field rather than the contrary. The agreement is no greater in scope than is necessary to protect DeLong in its legitimate interests and is not unduly harsh or oppressive on Lucas. The covenant not to compete is valid and enforceable. See Harrison v. Glucose Sugar Refining Co., 7 Cir., supra; Arthur Murray Dance Studios of Cleveland v. Witter, supra; Universal Winding Co. v. Clarke, supra. Cf. Guth v. Minnesota Mining & Mfg. Co., supra; Conmar Products Corp. v. Tibony, D.C.E.D.N.Y., 63 F.Supp. 372; McCall Co. v. Wright, supra; Reynolds Co. v. Dreyer, 12 Misc. 368, 33 N.Y.S. 649; Eastern New York Wet Wash Laundry Co. v. Abrahams, supra; Nordenfelt v. Nordenfelt [1894] A.C. 535; Eagle Pencil Co. v. Jannsen, supra.

Lucas contends that, even if valid and binding, the covenant does not cover any of the activities in which he engaged during the restricted period. He urges that it should be construed to mean merely "that he was not to bid, or assist others to do so on contracts to be let during the restricted period". He argues that, since he did not bid on such contracts or assist anyone to do so *during the restricted period,* none of his activities were in violation of his agreement.

This is not a tenable construction of the covenant not to compete.

Lucas was obligated between June 10, 1953 and June 10, 1955, "not to compete or assist anyone to compete" with DeLong "in any business related to [his] former employment" by DeLong. This business consisted of "engineering and sales" of "docks, barges, platforms and similar equipment for marine and/or oil field use including equipment making use of self-elevating mechanisms" of any kind.

■ No doubt such agreements are to be strictly construed. See Arthur Murray Dance Studios v. Witter, supra; Kaumagraph Co. v. Stampagraph Co., 197 App.Div. 66, 188 N.Y.S. 678; Greenfield v. Gilman, 140 N.Y. 168, 35 N.E. 435; 5 Williston on Contracts § 1633; 2 Restatement of Contracts § 513. But that is not to say that plain and unambiguous language must be ignored or that such agreements are to be given a strained or unnatural construction. Such agreements must be construed so as to give effect to the intent of the parties expressed in plain language. Baumann & Co., Brooklyn, v. Manwit Corp., 213 App.Div. 300, 207 N.Y.S. 437; Wirth & Hamid Fair Booking v. Wirth, 240 App.Div. 413, 269 N.Y.S. 709; Diamond Match Co. v. Roeber, 106 N.Y. 473, 13 N.E. 419; Universal Winding Co. v. Clarke, supra.

■ Here the plain language of the covenant restricts Lucas not only from bidding on contracts or assisting others to do so, but from any competition with the plaintiff or assistance in competition. This applies to all activities in both engineering and sales, the business in which DeLong was engaged. That business is plainly defined in the agreement just as the restrictions on Lucas' activities are plainly spelled out.

There is no doubt that Lucas violated this covenant during the two year restricted period. He was engaged in the development of devices and improvements in this field of an engineering nature. He sought to build a patent fence around these devices and improvements. He did this not only on his own account but under agreement with Morrison-Knudsen which was seeking to enter this new field in competition with DeLong. Morrison-

Knudsen financed his activities and had the benefit of them with disastrous results to DeLong's business and prospects. For it was because of Lucas' activities in developing and engineering these devices and improvements, particularly the Lucas jack, at their expense that Morrison-Knudsen was enabled to outbid DeLong on the very valuable Texas Tower contracts and virtually to exclude DeLong from this whole profitable field of activity in which DeLong had pioneered.

Lucas claims that all this amounted merely to preparation to compete which never ripened into actual competition until after the no-competition period had expired and was therefore not within the restrictions imposed upon him. There is no merit to this claim.

Mere planning may not in itself constitute competition. But where, as here, affirmative steps are taken which go beyond the planning stage, planning ripens into actual competition. See Cowley v. Anderson, 10 Cir., 159 F.2d 1; Pratt v. Shell Petroleum Corp., 10 Cir., 100 F.2d 833; Hunter v. Shell Oil Co., 5 Cir., 198 F.2d 485.

In the engineering and construction field in which DeLong and Lucas were engaged there is a substantial time lag between mere thinking and ideas and the concrete embodiment of those ideas in a large construction contract such as that for the Texas Towers. Texas Towers do not spring forth in full bloom. A large amount of research, development and engineering, as well as skill and know-how, are required as the experience both of DeLong and Morrison-Knudsen indicated.

That is plainly why Morrison-Knudsen was willing to finance Lucas' activities and to blend him into their organization. They acquired not only the benefits of the research and development which he was carrying on but his intimate knowledge of DeLong's devices, methods and unique experience which were thus made available to them. This is quite apart from his extensive activities in the patent field in an attempt to build a patent fence which

would exclude DeLong from proceeding along their own lines of development in the direction he was proceeding.

It is plain that Lucas violated his agreement not to compete and I so hold.

I also hold that the acts of Lucas in breach of his covenant not to compete were the proximate cause of the loss by DeLong of the Navy contracts and Texas Towers Nos. 3 and 4 on which Morrison-Knudsen outbid DeLong by such a small margin. For, as I have already said, it was the Lucas jack, the development of which had been financed by Morrison-Knudsen during the no-competition period which was the factor which made the difference in the bids submitted and which permitted Morrison-Knudsen, with no experience in this unique form of construction, to underbid the experienced and proved DeLong organization. This is quite apart from the other information which Morrison-Knudsen had been acquiring from its main competitor's former employee during the course of his association with them for some ten or more months of the restricted period.

It makes no difference that the actual bidding took place after the restricted period had expired, as Lucas urges. The acts which placed Morrison-Knudsen in a position to realize on their September 1954 understanding with Lucas took place during the restricted period itself. It would be unconscionable, indeed, to permit Lucas to escape liability for his breach of contract merely because he waited to realize on his breach until the restricted period had expired.

Lucas also argues that, regardless of whether he breached the agreement, laches on the part of DeLong bars any recovery. This contention requires little discussion. It is at best doubtful whether there is any doctrine of laches which would bar recovery here on what has now developed into a cause of action at law for breach of contract. See Treadwell v. Clark, 190 N.Y. 51, 82 N.E. 505; Cox v. Stokes, 156 N.Y. 491, 51 N.E. 316; Schreier v. Cummings, 250 App.Div. 808, 294 N.Y.S. 163.

But even if there were there are no elements of laches present here. There was no such course of conduct as in Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 207 F.2d 912, certiorari denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098, relied on by Lucas, where plaintiff, knowing that defendant had improperly obtained knowledge of its secret formula, nevertheless stood by and waited until four years after defendant had built an expensive plant to utilize the formula before bringing suit.

While a few rumors that Lucas was preparing to enter competition against them reached the ears of DeLong's officers, nothing came to their attention which would have put them on notice that Lucas was actively assisting Morrison-Knudsen to compete against them. Indeed, a letter from Morrison-Knudsen congratulating DeLong on its Texas Tower project remained discreetly silent on the subject of Morrison's intention to bid on the new Texas Tower contracts and, if DeLong had any suspicions as to what was going on, the letter served to allay them. Nor did the fact that on September 7, 1955, DeLong's officers viewed the prototype of the Lucas jack at Holyoke put DeLong on notice as to the purpose for which it was planned to be used, nor as to Lucas' extensive activities in violation of his agreement. Even had it done so DeLong would not have been required to take any action earlier than it did.

I hold that there was no laches on De-Long's part and no bar to recovery for that reason.

## II.

### Damages.

Thus DeLong has established that Lucas breached his covenant not to compete in important particulars and that because of his breach it suffered substantial damage. The only remaining question on this branch of the case is whether DeLong has proven the amount of damage which it suffered to an extent sufficient to entitle it to recover a money judgment.

DeLong's theory is that it is entitled to recover the losses which it suffered from its failure to obtain the contracts on Texas Towers Nos. 3 and 4 and that such losses are measured by its loss of prospective profits on the contracts had it obtained them.

Lucas maintains that such damages are too speculative to afford a basis for recovery and that DeLong has failed to prove any recoverable damages. I do not agree.

The bids of the DeLong-Raymond joint venture on Texas Towers Nos. 3 and 4 were prepared by experts from both organizations. The figures were based upon estimates made by employees of the joint venture on those items which were to be handled by it. Where items were to be manufactured by and purchased from an independent contractor the actual prices quoted were used.

Proper allowances for contingencies were made. One of the most important of these was bad weather. There is testimony that the weather during the period when the construction by Morrison-Knudsen was being carried out was excellent. This would tend to increase profits over the amount anticipated in the estimate.

The DeLong experts had wide experience in estimating costs and profits on construction of over-water platforms using self-elevating mechanisms, including Texas Tower No. 2, the mobile drill barges, the Greenland and Orinoco projects and the special docks made for the Transportation Corps. Both the DeLong and Raymond organizations were also experienced in more conventional methods of construction. The estimate figures were prepared in the regular course of business and with the bona fide intention of using them in the construction of the Texas Tower bid. They were not made with an eye to litigation, and, in fact, at that point litigation was farthest from DeLong's mind.

The DeLong-Raymond estimate of total direct costs on Texas Towers Nos. 3 and 4 was $14,462,774. Five percent, or

$723,129, was added for general and administrative overhead, and the difference between the total of $15,185,913 and the bid of $16,890,151 represented an estimated profit of $1,704,238, or 11.2%.

The sum of $12,685.90 was payable to DeLong by the joint venture for rental of its jacks for use on the project. Deducting this $12,685.90 as an expense of the joint venture from the estimated profit of $1,704,238, the balance of its estimated profit was $1,691,652. DeLong's share of the estimated profits would have been 37½%, or $634,369.54 with 37½% going to its co-venturer Raymond and 25% going to the fabricator of the Tower structures under a profit sharing arrangement. Thus, the estimated profit to which DeLong would have been entitled was $634,369.54, plus $12,685.90 to which it would have been entitled for jack rentals, or a total of $647,055.44.

These estimates, including the percentage of profit, are reasonable particularly in the light of testimony that the estimated profit on the two drill barges sold by DeLong in April of 1955 was 15% and the actual profit was 24½%, and that a normal profit in the heavy construction industry was 10%, but that 15% and 20% were normal where the work was specialized or hazardous. Admittedly, DeLong's profits might have turned out to be less than estimated. But it is equally if not more likely that they would have turned out to have been in excess of the estimate in view of DeLong's past experience, the liberal allowance made for contingencies, and the ample allowance made for administrative costs. DeLong's proof of damages is quite sufficient in the light of the well-recognized rule that mere doubt as to the certainty of the amount of damages should not preclude recovery from a wrongdoer.

▮▮▮▮ The contention that such damages are too speculative or uncertain to be allowed is without foundation. As the Court of Appeals of this circuit said in Matarese v. Moore-McCormack Lines, 2 Cir., 158 F.2d 631, 637, 170 A.L.R. 440:

"The rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain. Anderson v. Mt. Clemens Pottery Co., supra [328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515]; Bigelow v. RKO Radio Pictures, [327 U.S. 25], 66 S.Ct. 574, [90 L.Ed. 652]. Where the fact of damages is certain, the uncertainty of the amount will not prevent their being assessed. (Citing cases.)"

The Court of Appeals of the Tenth Circuit in Hedrick v. Perry, 102 F.2d 802, 807, expressed the rule in the following language:

"The tendency of the early cases was to restrict the recovery of damages to matters which were susceptible of having attributed to them an exact pecuniary value. But that rigid rule has been relaxed in some measure. Recovery cannot be had where there is uncertainty whether a contract has been breached or a tort committed, but damages may be awarded where there is no uncertainty as to whether the rights of plaintiff have been invaded even though there may be some uncertainty in respect to the amount of the damages sustained. The amount need not be proved with absolute certainty. It is enough if the evidence adduced is sufficient to enable the court or jury to make a fair and reasonable approximation."

See, also, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

The same principles are applied by the New York courts. See Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237.

Howard v. Stillwell & Bierce Mfg. Co., 139 U.S. 199, 11 S.Ct. 500, 35 L.Ed. 147, Ellerson v. Grove, 4 Cir., 44 F.2d 493, and Cramer v. Grand Rapids Show Case Co., 223 N.Y. 63, 119 N.E. 227, 1 A.L.R. 154, relied on by Lucas for the proposition that expected profits are too speculative to permit them to be used as a basis of

assessing damages, are not apposite. These cases relate to businesses about to be formed with no history of past profits. Here we have a going business, run by men experienced in estimating heavy construction costs in this unique field. There is no problem of determining prospective sales value. The bid on the towers fixed the anticipated revenue from these contracts.

Lucas has failed to adduce any proof that DeLong made or might have made use of its resources of personnel and material elsewhere so as to diminish or mitigate its loss of profits. I think it unlikely that it could have done so with the organization specially created to carry out a project of this unique nature. Texas Tower construction was solely a defense project. There were no other similar structures being constructed or contemplated. It is likely, in fact, that the loss of these contracts and the consequent break-up of the DeLong-Raymond organization set-up for this purpose may have permanently excluded DeLong from this profitable field of endeavor.

There is no basis on which to make any deductions or allowances from DeLong's loss of anticipated profits which may well be more than the monetary loss which it proved rather than otherwise.

I therefore find that DeLong was damaged in the sum of $647,055.44 and that it is entitled to recover this sum from Lucas.

### III.

### The alleged violation of the covenant not to disclose trade secrets.

DeLong also asserts that Lucas not only breached the covenant not to compete but also violated his covenant not to disclose trade secrets and confidential information during the restricted period. DeLong seeks an injunction restraining Lucas from continuing to use trade secrets or confidential information which he obtained during the period of his employment.

DeLong is not entitled to such relief. The agreement not to disclose such confidential matter for a period of two years plainly relieved Lucas from such restriction when the two years had expired. Thereafter he was under no such restriction and to impose continuing restraint upon him would not be in accordance with the agreement, nor would the result be equitable.

Moreover, DeLong has failed to establish that any trade secrets or confidential information were disclosed to its damage to anyone other than its competitor Morrison-Knudsen. Any such disclosure by Lucas was as much a breach of the no-competition covenant as it was of the covenant not to disclose. I have already awarded DeLong damages for the breaches of the no-competition covenant. It is not entitled to further relief but must look to the damages awarded it to make it whole. Indeed, it has not shown any actual damage arising from disclosure of trade secrets other than the amount already awarded for breach of the no-competition covenant.

Thus I will deny DeLong relief for alleged disclosure of trade secrets and confidential information during the restricted period as such and will dismiss its third cause of action seeking relief upon this theory.

### IV.

### The cause of action to compel the assignment of Lucas' patent applications to DeLong.

The second cause of action in the original complaint sought to restrain Lucas from making use of his cable jack in connection with the Texas Tower contracts or otherwise, and to compel him to assign to DeLong his patent application therefor (No. 444,287) filed on July 26, 1954. At the trial this cause of action was amended to include a claim for compulsory assignment to DeLong of Lucas' two patent applications for oil drilling barges (Nos. 432,453 and 454,098) filed on May 26 and September 3, 1954, respectively.

The theories on which DeLong seeks relief with respect to the cable jack and with respect to the drill barges are somewhat different and the two will be discussed separately.

(a) *The claims as to the Lucas cable jack*

The request to restrain Lucas from making use of his cable jack on the Texas Towers had become academic long prior to the trial. DeLong's claim to be entitled to a compulsory assignment of the patent application on the cable jack is based on three different theories:

1. That the Lucas cable jack mechanism was an improvement on Lucas' slip jack which he had assigned to DeLong under the settlement agreement of June 10, 1953, together with "any and all improvements" thereon.

2. That the cable jack invention was DeLong's property which Lucas learned about during his employment and had misappropriated.

3. That the invention was made by Lucas during the period in which he covenanted not to compete with DeLong and the patent application was filed in violation of that covenant.

The settlement agreement of June 10, 1953, provided that Lucas would assign his slip jack invention to DeLong's predecessor, including United States Patent Application No. 348,269 and all rights to the invention represented by the said patent application, and to any and all improvements on the said invention. Lucas also agreed to render all necessary assistance in prosecuting the patent application and to deliver all drawings, sketches, descriptions and other matter concerning it. He warranted that the patent application and such drawings, sketches, etc. contained "a complete description of any and all inventions discovered or invented [by him] during the term of his employment in respect to docks, barges, platforms and similar equipment for marine and/or oil field use, including equipment making use of self-elevating mechanisms, pneumatic, mechanical, manual or otherwise".

Simultaneously with the execution of the settlement agreement Lucas executed an assignment of the slip jack patent application and a quitclaim assignment of all inventions discovered by him during the term of his employment.

It is well settled that an agreement to assign a patent and improvements thereon covers only improvements existing at the time the agreement was entered into unless the language specifically refers to future improvements. The law does not look favorably upon covenants which place "a mortgage on a man's brain, to bind all its future products". Aspinwall Manufacturing Co. v. Gill, C.C.D.N.J., 32 F. 697, 700. See, also, Monsanto Chemical Works v. Jaeger, D.C.W.D.Pa., 31 F.2d 188; American Cone & Wafer Co. v. Consolidated Wafer Co., 2 Cir., 247 F. 335; Allison Bros. Co. v. Allison, 144 N.Y. 21, at page 29, 38 N.E. 956, at page 958. As was said in Allison, to effect an assignment of future improvements to a patent which the inventor may thereafter produce "the language of the contract must be very plain and evidence unmistakably that such an agreement was in the mind of the inventor".

There is no such language in the agreement at bar. While the settlement agreement refers "to any and all improvements on the said invention" there is no language which indicates that this was meant to include any future "improvements" to the assigned slip jack which Lucas might thereafter invent or devise. Moreover, the actual assignments executed by Lucas and accepted by DeLong do not use the word "improvements" at all.

A comparison of the language used in the settlement agreement with the language used in cases cited by DeLong holding assignments applicable to future improvements, indicates plainly the failure of the agreement at bar to accomplish the result for which it con-

tends.[3] The language evinces no more than an intention to cover improvements in existence at the time of its execution and does not cover future improvements. In the absence of such language "an employee is not forbidden, after leaving the service of his employer, from giving expression to inventive thoughts and ideas and indeed making improvements upon basic patents which have become the property of his former employer". New Jersey Zinc Co. v. Singmaster, 2 Cir., 71 F.2d 277, 279.

There is no evidence here that the cable jack was invented, designed or developed by Lucas during the period of his employment or prior to the execution of the settlement agreement and the accompanying assignments on June 10, 1953. He first sent very rough pencilled sketches of the device to his patent attorney in July of 1953, some time thereafter. These merely roughed out the principle and required much work before they could be considered to be anything more than an idea. The patent application was not filed until May, 1954, almost a year later. It is true that there had been some talk of employing the Chinese finger-grip principle, used in the cable jack, in an improved jacking device while Lucas was in DeLong's employ. But such talk amounted to no more than a casual mention of the principle by Lucas. It was too nebulous to constitute a conception much less an invention, or the development of an improvement. See Monsanto Chemical Works v. Jaeger, supra, 31 F.2d 188, at page 191.

I hold that the Lucas cable jack was not within the terms of the June 10, 1953, agreement or the assignment of the Lucas slip jack, or the quitclaim assignment made at the same time, and that DeLong is not entitled to an assignment of the Lucas patent application on that theory.

DeLong also urges that the Lucas cable jack was in essence a device which it developed during Lucas' employment, that the cable jack was its property which Lucas wrongfully appropriated, and that it is entitled to an assignment of the cable jack patent applications on that ground. Its claim is that the cable jack is merely a modification of the slip jack invention which Lucas had assigned to DeLong under the terms of the settlement agreement and embodies no new or original ideas which can be the subject of invention. It argues that all forms of the Lucas cable jack do no more than substantially copy the basic principles of operation of the Pointer air jack developed by DeLong and add thereto various desirable additional features found in the assigned slip jack.

It should be noted that the question presented is not one of patentability or of infringement. Counsel for both sides agreed at the trial that questions of whether or not Lucas' cable jack application in fact embodied a patentable invention or whether the slip jack application or any patent which might be granted thereon had been infringed were not before me and were left to be determined in such patent litigation between the parties as might be brought separately.

3. E.g., Guth v. Minnesota Mining & Mfg. Co., 7 Cir., 72 F.2d 385, 387:

"all my rights to inventions which I have made or conceived, or may at any time hereafter make or conceive."

Wege v. Safe-Cabinet Co., 6 Cir., 249 F. 696, 697:

"all present and future mechanical improvements of the safe-cabinet."

Universal Winding Co. v. Clarke, D.C. Conn., 108 F.Supp. 329, 335:

"all inventions and improvements heretofore or hereafter made or invented by me at any time during my employment by the Company or within one year from the termination of such employment."

Dry Ice Corporation of America v. Josephson, D.C.E.D.N.Y., 43 F.2d 408, 414:

"all the right, title and interest * * * in and to any letters patent * * * which may hereafter be issued on any of the inventions enumerated * * * or any amendments thereto or improvements upon the devices therein mentioned, or to any extensions or renewals of said letters patent, or in any applications which may be filed, * * * all of which, without regard to the date when applied for or issued, shall be assigned and transferred."

Thus, the question here is whether the cable jack was so similar to the jacking devices previously developed by DeLong as to make the cable jack DeLong's property which Lucas misappropriated.

The original Pointer air jack using rubber grippers, the wedge or slip jack, and the cable jack, have much in common both in design and purpose. Each is designed to raise floating platforms or barges above the surface of the water supported on caissons. Each has circular upper and lower gripper sections which surround the caisson. In each the floating barge or platform is raised on the caisson by the alternate gripping and lifting action of the upper and lower gripper sections.

While the Pointer air jack used rubber grippers, the slip jack, in contrast to the air jack, had a self-energizing gripping action brought about through metal to metal contact with the caisson.

One of the objects of the slip jack, as set forth in the patent application, is claimed to be "an improved gripping means for engaging the uprights to provide an effective mechanical wedging self-locking mechanism" and "an improved power jack construction having a falling safe management". The gripping devices of the jack are "self-energizing" and have teeth to engage the caisson.

The Lucas cable jack also uses a self-locking self-energizing device. The application recites that one of its objects is to provide a jacking device "wherein the gripping elements are self-energizing" and that "will effect and maintain a tight grip upon a caisson even when power fails when under load".

Both the wedge or slip jack and the cable jack have metal teeth in their gripping devices. The positions and action of both in relation to the caisson as the raising or lowering action takes place, are substantially similar. However, there is a substantial difference between the principle by which the gripping and self-energizing action is brought about in the slip jack and in the cable jack.

This difference lies in the use of the so-called Chinese finger-grip principle in the cable jack in contrast with the wedging action used on the slip jack.

In the slip jack the caisson is gripped by toothed wedges or grippers moved axially by cylinders and the grip depends upon a wedging action with wedge rings causing the grippers to engage the caisson.

The cable jack grips by meshed cables carrying toothed metal fittings. These are arranged in a symmetrical criss-cross fashion. The gripping action is based on the Chinese finger-grip principle and is applied by the application of pull to the ends of the meshes. The mesh grips tighter the more pull is exerted and is self-energizing for the same reason.

There are other differences in the two jacks, including the manner in which the upper and lower gripping devices operate in relation to the barge and in relation to one another, in the manner in which these devices are affixed to the barge and used, and in the greater ease with which repairs of worn or broken parts could be effected on the cable jack without removing the jack from the caisson or the caisson from the jack. But these are of minor significance.

The method or principle by which gripping action and self-energization is accomplished is sufficiently different to indicate that the cable jack is more than an insubstantial modification of the slip jack. It is a new development in an essential feature of the mechanical means employed to carry out a major object of the device.

Such modifications of the cable jack as are found in the prototype jack which Lucas had manufactured in the summer of 1955, and which were used in preparing the Morrison-Knudsen Texas Tower bids, do not change this conclusion. Moreover, it does not appear that Lucas applied for any patent on these modifications prior to the expiration of the no-competition period.

Thus the Lucas cable jack was not an appropriation of the Pointer air jack and

the slip jack, as DeLong contends. The gripping and self-energizing principle employed was not DeLong's property misappropriated by Lucas, but was developed by him. Whatever claims, if any, DeLong may have as to patentability or infringement, it may assert in an appropriate action brought on such theories. But it is not entitled to have the cable jack patent application assigned to it upon its misappropriation theory.

■ Finally, DeLong contends that it is entitled to an assignment of the Lucas cable jack application on the ground that it was developed and the application filed during the two year no-competition period provided in the agreement of September 10, 1953, in violation of Lucas' covenant not to compete.

DeLong is not entitled to mandatory assignment of the cable jack application on this theory either. There was nothing in the settlement agreement prohibiting Lucas from developing ideas or improvements of his own during the no-competition period. The agreement did not contemplate a two year period of sterilization during which he was precluded from using his inventive brain in the field in which he had been employed by DeLong. Nor do I find any specific restriction on the filing of a patent application on any improvements or developments which Lucas devised between June 10, 1953 and June 10, 1955.

All that was forbidden was engaging in competition or in assisting others to compete with DeLong or disclosing trade secrets. In so far as Lucas' activities in collaboration with Morrison-Knudsen (including those in connection with the cable jack) constituted a violation of his no-competition agreement, I have already awarded DeLong the damages which it proved arose from such violations. DeLong has not shown any other damage. The award of damages already made to DeLong affords it all the relief to which it is entitled arising from the development and use of the Lucas cable jack. It is not entitled to the assignment of the cable jack or of the patent applications or patents for it.

(b) *The claim as to drill barge applications.*

DeLong's claim for assignment of Lucas' two patent applications on drill barges, Serial numbers 432,543 and 454,- 098, filed respectively on May 26, 1954 and September 3, 1954, and the foreign patents and patent applications based thereon, is predicated on two theories.

■ First, DeLong urges that these were inventions made by Lucas during the course of his employment and covered by the settlement agreement and the quitclaim assignment executed pursuant thereto. DeLong therefore asks that assignment be compelled by way of specific performance of these undertakings. Secondly, it asserts that the two Lucas drill barge applications embody property by way of ideas and inventions belonging to DeLong with which Lucas became familiar during the course of his employment, and which have been misappropriated by him from DeLong. This theory is not based on the agreements or assignments but upon the well settled equitable doctrine that an employee who misappropriates his employer's confidential ideas and inventions may not retain the fruits of his wrong.

■ There is no merit to the first of these theories, and it is to some extent inconsistent with the second. DeLong has not established that the drill barges described in the Lucas patent applications were inventions made by Lucas during the course of his employment by DeLong, which is essential to that theory. On the contrary, assuming the drill barge developments covered by the Lucas applications are in substance the same as those belonging to DeLong, it appears that these were developments made by DeLong rather than Lucas and were not his in any sense of the word.

The question then on this branch of the case is whether the drill barge developments incorporated in the two Lucas patent applications were DeLong's property which Lucas learned about through his employment by DeLong and thereafter misappropriated. Again, it may be noted

that there is no question of patentability or infringement involved and any such questions are left for determination in separate actions.

Before DeLong and its predecessors developed self-elevating over-water oil drilling barges the only mobile drill barge in operation was a submersible barge used in shallow water in depths up to fifteen feet. Apart from limited use of this equipment, the practice was to construct small permanent platforms by the use of floating pile drivers and derrick barges. The drilling equipment supplies and crew quarters were carried on a floating tender moored to the permanent platform. As drilling began to be conducted in deeper water large permanent drilling platforms were installed carrying crew quarters and all other equipment, which were often left in place after drilling was completed because of the high cost of dismantling them. The DeLong mobile offshore drilling barge with its self-elevating mechanisms substantially reduced the cost of drilling, particularly in depths of forty feet or more. These platforms, carrying all necessary drilling equipment, including crew accommodations, could be raised on the caissons to carry out the drilling operations, and then lowered to the water and towed to another drilling site, leaving a relatively small producing platform carrying the necessary producing equipment.

The DeLong drill barges constructed and in operation up to the time of the trial had a slot or bay at one end of the barge through which the drilling was accomplished. The drilling equipment was mounted on rollers or skids and could be moved back and forth over the slot or bay for purposes of drilling and of installing a permanent producing platform if a well was brought in.

These barges were massive structures, frequently two hundred feet long and one hundred feet wide, and weighing over five thousand tons. Since the producing platform was constructed within the slot or bay it was a difficult and delicate maneuver in the face of any substantial wind or wave action to move the barge away from the producing platform after it had been lowered to the water, or to maneuver the barge so as to straddle the platform preparatory to jacking it up for reservicing. There was substantial danger of smashing the platform or damaging the barge, or both. Moreover, there was a serious risk of fire endangering both crew and equipment should the barge strike the producing platform and break the well-pipe.

Therefore DeLong sought to develop a self-elevating drill barge which would overcome the hazards inherent in the use of a barge, with a slot or bay. It undertook to design a drill barge which could conduct the drilling operation and construct the producing platform at some distance from the end of the barge rather than through a slot or bay in the barge itself. DeLong developed four schemes to carry this into effect.

The first, embodied in two drawings dated January 19, 1953, mounted a stiff-legged derrick on the standard type of DeLong mobile barge. The derrick could be swung out beyond the barge and a small platform supported on brackets could be extended outward from one end of the barge by the use of the derrick. The platform had openings at the corners through which caissons or pilings could be driven to the bottom and it could thus be left as a permanent producing platform if a well was brought in. The barge also carried an elongated bridge structure which could be picked up by the derrick and moved into position spanning the place between the barge and the platform carrying part of the drilling equipment. The derrick was used also as a drilling derrick and the remaining drilling equipment was carried on the barge. Thus, the hazards of operating through a slot or bay in the barge were largely eliminated.

A second such scheme was embodied in drawings dated March 24, 1953. It also included the platform outboard of the barge and a bridge structure mounted on transverse tracks so that it could be moved back and forth laterally along the end of the barge. The bridge structure

also carried an overhanging derrick which could be pivoted so as to drill through the platform, and various parts of the drilling equipment. This scheme was the subject of United States Patent Application No. 392,592 filed by DeLong on November 17, 1953.

A third such scheme was embodied in another drawing dated March 24, 1953, with some differences in arrangement, principally by having the bridge structure mounted so as to move longitudinally as well as laterally on the barge so as to enable the derrick and drilling equipment to overhang.

The fourth and most practical development was embodied in a drawing dated May 1, 1953. It used a similar small platform which could be swung into a horizontal position outboard the end of the barge, a truss-like bridge structure mounted on tracks which could be slid outboard over the platform with a conventional drilling derrick over a rotary table at the outboard end of the bridge structure. A standard whirley crawler crane was mounted on the deck of the barge to install the piling necessary to convert the outboard platform into a permanent producing platform. This scheme was embodied in DeLong's United States Patent Application, Serial No. 427,554, filed on May 4, 1954.

There is no doubt that Lucas became thoroughly familiar with these developments during his employment by DeLong. He worked closely with Suderow, DeLong's chief engineer, in evolving the first scheme, and participated in discussions of it with Colonel DeLong. In fact, Lucas, without authority, had his name placed on the drawings of January 19, 1953, had copies made from the original tracings which have disappeared from DeLong's files, sent them from Venezuela to his patent counsel some time before he left DeLong's employ, and later had them transferred to his own patent counsel in Washington, who worked on Lucas' own drill barge patent applications. At the trial copies of these drawings turned up in the files of Lucas' Washington patent counsel.

His claim that Colonel DeLong thought there was little practical merit in the developments shown on the January 19, 1953, drawings and was unwilling to spend any money on them, even if true, did not entitle Lucas to appropriate them to his own use. But this claim is belied by evidence to the contrary, and, indeed, by Lucas' own statement in his letter to patent counsel that DeLong was "quite enthused about this development".

Lucas also participated in the development of the second scheme and had many discussions with Suderow regarding the details portrayed in the drawings both before and after they were completed. He also participated in the third development, assisted in preparation of the earlier sketches and was familiar with the scheme. While there is no evidence that the final drawings on the fourth scheme were seen by Lucas, there had been considerable discussion of this scheme and its details with him.

These four schemes were part of the extensive development work which DeLong was doing in the improvement of its basic equipment as a result of its knowledge and practical experience in the field. The fourth scheme is a logical development of the continuing studies which the DeLong organization was making for the future. As these ideas developed more and more of the drilling equipment was proposed to be mounted upon the bridge structure. In the fourth development conventional land drilling equipment could be employed without the necessity of resorting to such non-conventional devices as the stiff-legged derrick proposed for the first development, or the two overhanging derricks in the second and third. Moreover, more attention was being given to the proper adjustment of weight balance on the barge so as to prevent overweighting of the end on which the drilling equipment was to be mounted.

There is no doubt that all of these developments were confidential and that Lucas well knew them to be so. He himself was a member of the small circle of top DeLong people who were the only

ones familiar with the pattern of these developments. There was certainly no need for anyone to explain to Lucas the confidential nature of what was going on, and there is no merit to his suggestion that he had access to this material on anything other than a confidential basis.

On May 26, 1954, Lucas filed United States Patent Application No. 432,543 on a multi-purpose derrick barge for oil drilling and servicing. On September 3, 1954, he filed patent application No. 454,098 for a second such barge.

There is every indication from a comparison of the DeLong drawings of January 19, 1953, with these patent applications, that the drawings which Lucas had obtained from DeLong's own file served as the basis for his applications which also embodied some of the features from the other DeLong schemes with which Lucas was familiar. In his patent applications Lucas stressed the advantages of drilling through a platform extending from the end of the barge as compared with the disadvantages of drilling through a slot or bay in the barge itself. He emphasized the fire and other hazards resulting from the former method. Such disadvantages were also pointed out in the analysis and comparison of the proposed Lucas schemes with the DeLong developments by Lucas' own engineer, Duncan, in a report to him made in September 1954.

The differences between the DeLong schemes and the Lucas scheme are slight and consist largely in the substitution of a somewhat different type of drilling derrick and a change in the order of the steps to be taken under the DeLong scheme. Under the Lucas scheme the producing platform was to be supported on piles prior to the drilling rather than after the well was brought in, so that there would be greater support for the drilling load by the producing platform.

These differences are insubstantial and are insufficient to differentiate the schemes embodied in the two Lucas patent applications from those which had been developed by DeLong. All of the basic combination of elements in the DeLong schemes are present in the Lucas patent applications. Both involved the mobile offshore platform developed by DeLong which could be raised above water on caissons by means of self-elevating mechanisms. In both there is an elongated truss-like bridge structure, movable longitudinally along the deck of the barge so that one end can be projected beyond the end of the barge. In both all drilling equipment is mounted on the bridge structure with the heavier components such as mud-tanks and pumps, engine drives and pipe racks, mounted on the aft end of the bridge structure to act as a counterweight and prevent overbalancing. In both a conventional drilling derrick, a rotary and draw-works are mounted on the platform end of the bridge structure. In both the bridge structure is used to drill downward through a producing platform projecting beyond the end of the barge. In both the major object was to avoid the hazards arising from the old slot type barge by drilling through a platform set some distance from the end of the barge.

As Lucas himself said in his memorandum of April 18, 1955 to Morrison-Knudsen, his patent applications on the drill barges were a part of his effort to build a patent fence around what he called his "system". However, this was not his system at all but an appropriation with insubstantial modifications of the DeLong methods, equipment and developments which he had learned about on a confidential basis while in DeLong's employ.

I hold, (1) that the drill barge developments for drilling outboard of the barge and the use of platforms extending beyond the end of the barge capable of installation as permanent structures embodied in its various drawings and in its two patent applications numbers 392,592 and 427,554, were devised by the DeLong organization and were DeLong's property; (2) that these developments were confidential; (3) that Lucas had access to them and became familiar with them

**134**

through, and only through, his employment by DeLong in a capacity of trust; (4) that Lucas used these developments and embodied them in his patent applications numbers 432,543 and 454,098, filed respectively May 26, 1954 and September 3, 1954; and (5) that Lucas thereby misappropriated DeLong's property consisting of its confidential ideas, developments, inventions and improvements.

Where, as the result of a breach of confidence, a former employee has acquired and sought to patent ideas or inventions developed by his former employer, he may be compelled to relinquish all rights to such property which he has wrongfully acquired. In such cases the courts will hold the wrongdoer to be a constructive trustee of the property misappropriated and will order a conveyance by the wrongdoer to the former employer. Houghton v. United States, 4 Cir., 23 F.2d 386; Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 36 F.2d 623. See, also, Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303; Colgate-Palmolive Co. v. Carter Products, 4 Cir., 230 F.2d 855; Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752; Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560.

The application of these well settled principles to the case at bar requires that Lucas be directed to assign to DeLong his United States Patent Applications Nos. 432,543 for a multi-purpose derrick barge, and 454,098 for a well drilling and servicing barge, filed on May 26 and September 3, 1954, respectively, any patents which may have been granted thereon, and all foreign patent applications and patents based on these United States applications.

Judgment will be entered in favor of DeLong and against Lucas in the sum of $647,055.44, with interest thereon from the date of the commencement of this action. The judgment will also direct that Lucas shall assign to DeLong United States Patent Applications, Serial Nos. 432,543 and 454,098, together with any patents which may have been granted

thereon, and all foreign patent applications and patents which are based thereon.

Submit judgment in accordance with this opinion on ten days' notice.